839 So.2d 995 (2003)
STATE of Louisiana, Appellee,
v.
Bobby COOPER, Appellant.
No. 36,830-KA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2003.
*996 Lavalle B. Salomon, Monroe, for Appellant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Geary Aycock, J. Michael Ruddick, Assistant District Attorneys, for Appellee.
Before BROWN, GASKINS and KOSTELKA (Pro tempore), JJ.
GASKINS, J.
Following a jury trial, the defendant, Bobby Cooper, was convicted of second degree murder and sentenced to the mandatory term of life imprisonment without benefit of probation, parole or suspension of sentence. The defendant's conviction and sentence are affirmed.

FACTS
On the night of November 7, 1997, the 18-year-old victim, Earl Williams, borrowed a car belonging to his friend, Derrick Handy. He later returned to the Handy residence where he spent the night. Since the victim forgot to return the car keys before he left the next morning, Derrick's 11-year-old brother, Johnny Handy, said he would go get the keys.
The victim ate breakfast at home with his mother, Linda Williams, on the morning of Saturday, November 8. He then left the house on a bicycle.
Robbie Jenkins, a cousin of Derrick Handy, walked to a local store at about 8:30 or 9:00 a.m. She observed the defendant driving a white car up and down Girod Street and around the neighborhood; he was accompanied by two other persons who she identified as Teese and Kelo. The car was proceeding very slowly. When she was walking home at about 10:00 a.m., she saw them again, driving on Girod.
Angela Smith resided in the Carver Homes area of Monroe. As she and her daughter walked to the store, she also saw a white car driving slowly. They saw it once on the way to the store and once on the way back. She remarked to her daughter that the occupants appeared to be looking for someone. As Ms. Smith and her daughter walked down Girod Street at about 11:00 a.m., she saw a bicyclist approaching her. At this point, the white car was behind her. Suddenly, the boy on the bicycle jumped off and began running. Ms. Smith observed no gestures or words by the bicyclist toward the car occupants. He had no weapon in his hand. The driver of the white car stopped the vehicle and jumped out, running after the bicyclist. She then heard more than two gunshots. The driver returned to the car and got in on the passenger side; the white car left. Ms. Smith saw the bicyclist lying on the ground, bleeding.
Lucille Young was driving down Girod Street when she saw a boy on a bicycle ahead of her. He dropped the bike in the street in front of her car and began running. Ms. Young then saw the driver of a *997 white car jump out and chase the bicyclist; she thought that they were shooting "pop guns." She testified that she heard about two shots. Ms. Young stopped her car to remove the bicycle from her path. When the driver came back, he stared at her and got in the passenger side of the white car. Ms. Young testified that she did not see the victim approach the white car; furthermore, she did not see him with a gun or knife.
Johnny Handy was with two friends near a gate on Girod. He saw the victim riding a bicycle toward them; he then saw the white car. The victim jumped off the bike and ran, yelling at Johnny and his friends to run. The young boys ran through a gate; the victim was behind them. Johnny testified that he heard four gunshots. When it was quiet again, he came out of hiding behind a porch and saw the victim lying on the ground, bleeding from his mouth. The victim told Johnny to get his mother.
Johnny went to the victim's house and told Ms. Williams that the victim had been shot. She testified that her son was still alive when she arrived at the crime scene.
By the time the police arrived, a crowd had gathered. The officers found Derrick Handy's car keys on the ground near the victim. None of the witnesses observed a gun or knife near the spot where the victim was lying. One of the first officers on the scene detected no pulse when he checked on the victim's condition. Emergency personnel arrived and began CPR. The victim was transported to a hospital where he died from a gunshot wound that entered on the far left flank, near the back. However, the police initially believed that the victim had been shot twice.
The police began taking statements from witnesses. One witness described the shooter as wearing a dark jacket or shirt with red trim.
That afternoon, Detective Roderick Jackson received a telephone call from Ms. Williams. She had received information that the defendant was the shooter; she said that members of her family were out looking for the defendant and might harm him. Detective Jackson knew the defendant's father, Bobby Cooper, Sr. He called Mr. Cooper and advised him that his son was a possible suspect in a shooting and that people were looking for him to harm him. He asked Mr. Cooper to try to locate the defendant and bring him to the police station.
The defendant, who lived with his father, arrived at the home of his mother, Lagunda Foster, looking "frightened." He went to a bedroom and laid down. Mr. Cooper arrived to get the defendant to take him to the police station; Ms. Foster accompanied them. En route to the police station, they were stopped by Detective Jackson, who then followed them to the station.
Following their arrival at the police station, Detective Jackson sat with the defendant and his parents in the lobby area of the detective squad room. They waited for the arrival of Detective William Webb; since this was Detective Jackson's first homicide investigation as a detective, he asked Detective Webb, a more senior detective, to assist in taking the defendant's statement. Detective Jackson testified that while they waited, he advised the defendant of his rights; the parents disputed this at trial and testified that he told them that the defendant didn't need a lawyer.
After Detective Webb arrived, the 20-year-old defendant accompanied the detectives to an interrogation room; his parents waited outside. The defendant was advised of his rights; he initialed and signed a rights waiver form. According to the detectives, their general procedure is to first talk informally with the person, then request permission to take a recorded *998 statement. Detective Jackson informed the defendant, who was wearing a dark jacket with red or rust trim, about the description of the shooter's jacket. The defendant stated that when he shot the victim he was wearing a white T-shirt and a Cowboys cap; he said he had burned that clothing. Having been told at the hospital that the victim was shot two times, Detective Jackson asked the defendant why he shot the victim twice. The defendant replied, "I didn't shoot the m_____f_____ twice, I shot the m_____ f_____ four times." Detective Jackson testified that the defendant claimed that he and the victim had an altercation the night before the shooting during which the victim shot up the defendant's car. The defendant further claimed that immediately prior to the shooting, the victim motioned for him to come over and then produced a knife.
The detectives asked the defendant to give them a recorded statement. He refused. At this time, the defendant was placed under arrest and booked on one count of second degree murder.
The defendant filed a motion to suppress his statements to the police. A hearing was held on the motion on November 4, 1998. Detective Jackson was the only witness to testify at the hearing. The motion was denied.
Following a jury trial in July 2001, the defendant was convicted as charged. He was sentenced to the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. A timely motion to reconsider sentence was denied. In July 2002, the defendant was granted an out-of-time appeal.

MOTION TO SUPPRESS
The defendant argues that the trial court erred in denying his motion to suppress his statement to the police.

Law
The purpose of a suppression hearing is to determine if evidence should be presented at trial. State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488. At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La. 1977); State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. Before the state can introduce an inculpatory statement made in police custody, it bears the heavy burden of establishing that the defendant received Miranda warnings and that the statement was freely and voluntarily made and not the product of promises, threats, or duress. La. C. Cr. P. art. 703; La. R.S. 15:451; State v. Johnson, 36,014 (La.App.2d Cir.6/12/02), 821 So.2d 652.
A defendant's right to counsel is guaranteed in La. Const. art. 1, § 13. When counsel is requested, interrogation must cease; officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990); State v. Williams, XXXX-XXXX (La.11/1/02), 831 So.2d 835.
The determination of whether the accused actually invoked his right to counsel is an objective inquiry. Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); State v. Payne, XXXX-XXXX (La.12/4/02), 833 So.2d 927. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a *999 reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. Davis, 512 U.S. at 459, 114 S.Ct. at 2355. A suspect must "unambiguously request" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. Davis, 512 U.S. at 459, 114 S.Ct. at 2355.
The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Richardson, 33,272 (La.App.2d Cir.11/1/00), 779 So.2d 771, writ denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1151. We place great weight upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Roddy, supra.

Discussion
At the motion to suppress, Detective Jackson testified that he advised the defendanta 20-year-old adultof his rights in front of his parents and then again in the interview room after another detective arrived to assist with the interview. He testified that he made no promises to the defendant in return for talking to him. He did not threaten or coerce the defendant. The defendant signed and initialed a rights waiver form. At trial, the defendant's parents identified their son's signature on the form.
The detective also testified that after he first advised the defendant of his rights in front of his parents, the defendant's father made a comment that they might want an attorney later. Detective Jackson testified that he told them that they had that right.
The record supports the trial court's finding that the state met its burden of proving beyond a reasonable doubt the free and voluntary nature of the defendant's statement to the police. The testimony of the detective demonstrated that the defendant was adequately advised of his Miranda rights and that he waived those rights. No evidence was presented that the defendant acted under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Furthermore, the trial judge obviously found that no request for an attorney was made on the defendant's behalf prior to questioning. The comment of the defendant's father that they might want a lawyer later falls woefully short of an unambiguous request for counsel which is sufficiently clear so that a reasonable police officer in the circumstances would have understood the statement to be a request for an attorney.[1] Since the trial court's ruling on the motion to suppress is supported by the evidence, its conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal.
This assignment of error lacks merit.

STATUS AT TIME OF STATEMENT
In his second assignment of error, the defendant contends that the trial court *1000 erred in restricting his ability to present evidence about the totality of the circumstance surrounding the making of his inculpatory statement to the police. Specifically, he claims that he was not allowed to explore whether he was under arrest at the time or if he was misled as to his status and degree of risk.
At the suppression hearing, the defense asked Detective Jackson twice whether the defendant would have been released if he had refused to make a statement. The first time the state objected because the question called for speculation and on the basis of relevancy; the second time as to relevancy. The objections were sustained, and defense counsel requested that his objection to the court's ruling as to the second instance be noted. However, the defense then went on to elicit from the officer that the defendant was not handcuffed and that he was informed, by way of the rights waiver form, that he was not under arrest. Thus, it cannot be said that the defendant was not allowed to explore his status at this hearing.
During the testimony of the defendant's father at trial, defense counsel elicited his version of what transpired before Detective Webb arrived. Mr. Cooper testified Detective Jackson did not advise his son of any rights in his presence. The state initially objected when Mr. Cooper began to recount Detective Jackson's response to his question about what would take place next. The state then stipulated that Detective Jackson said he was going to call Detective Webb to come in and take a statement.[2] Thus, the defendant obtained the information he sought despite the state's initial hearsay objection.
Furthermore, at trial, both Detective Jackson and Detective Webb were asked on cross-examination about the defendant's status. Detective Jackson, the lead detective on the case, testified that the defendant was not under arrest, that he was told he was not under arrest prior to the interview, and that he could have left. Detective Webb, whose only apparent involvement in the case consisted of assisting with the defendant's interview, testified that he assumed that the defendant was free to go; to the best of his knowledge, the defendant was not under arrest.
Under the circumstances presented here, we find that the defendant was allowed to adequately explore the totality of the circumstances surrounding his statement. This assignment of error has no merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] At trial, the defendant's parents testified that they asked whether they should get an attorney and that Detective Jackson told them that the defendant didn't need a lawyer because they just wanted to ask him some questions. However, the detective denied that such an exchange took place. To the contrary, he testified that the defendant's father stated that they might want to get a lawyer later and that he told them that would be okay. It is apparent that the jury resolved this credibility call in favor of the detective.
[2] Mr. Cooper then testified that before his son was escorted to the interrogation room after Detective Webb arrived, he said they wanted an attorney and he asked if his son was under arrest. When defense counsel asked for the detectives' response, the state objected. The trial court called counsel up for a brief bench conference. At the conclusion of the conference, the defense made no contemporaneous objection to preserve for appeal any complaint concerning the court's ruling on this matter. When the defense resumed Mr. Cooper's direct examination, he testified that he and the defendant's mother were not allowed to go into the interrogation room with their son and that the next time they saw him, he was not free to leave with them.