PEATROSS, J.
 

 | defendant, Theodore Roosevelt Moore, was charged with second degree murder. After a jury trial, Defendant was convicted as charged and sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. Defendant now appeals. For the reasons stated herein, Defendant’s conviction is affirmed.
 

 FACTS
 

 On August 11, 2006, around 10:00 a.m., Annie Mae Jackson, a housekeeper at the Palms Motel in Monroe, Louisiana, discovered Joseph Murphy lying unresponsive on a motel bed in Room 25. Paramedics were called to the scene and discovered that Mr. Murphy had been severely beaten. He was taken to the hospital, diagnosed as having suffered a lethal brain injury and placed on a respirator. Four days later, after he developed severe pneumonia, medical personnel made the decision to terminate Mr. Murphy’s life support. Mr. Murphy was 28 years old at the time of his death.
 

 Investigating officers of the Monroe Police Department (“MPD”) found a broken 2x4 board in the motel room lying across the bed next to the bed where Mr. Murphy’s body was found. A smaller piece of the same 2x4 board that had broken off was found on the floor between the two beds. Officers concluded that there were no signs of forced entry into the motel room. Defendant, who had been sharing the room with Mr. Murphy, was missing. Officers immediately began the process of locating Defendant so they could question him about Mr. Murphy’s injuries.
 

 | ¡.Officer Dawayne Crowder of the MPD found Defendant walking near Pine Street in Monroe and stopped to talk to him. Defendant agreed to go to the police station where, after being advised of his
 
 Miranda
 

 [1]
 
 rights, he denied having anything to do with Mr. Murphy’s injuries. While questioning him at the station, officers asked Defendant if he would give them his socks, shoes and pants for testing and allow them to obtain a DNA sample at St.
 
 *526
 
 Francis Hospital. Defendant agreed and gave officers the items. The officers provided Defendant with other clothes to wear, ended the interview and subsequently transported Defendant to the hospital for a DNA test.
 

 Forensic lab results indicated that both Defendant’s and Mr. Murphy’s DNA were found on the small broken piece of the 2x4 board which was found on the floor of the motel room. Mr. Murphy’s DNA was found on the larger piece of the broken 2x4 board. Consequently, officers executed a warrant for Defendant’s arrest. On May 3, 2007, Defendant was charged with the second degree murder of Mr. Murphy.
 

 On February 26, 2008, Defendant filed a motion to suppress, alleging that the officers had failed to properly inform him of his
 
 Miranda
 
 rights prior to taking his statement on August 11, 2006. Defendant further claimed that the officers had misled him as to the nature and purpose of their questioning because they told him they were investigating an aggravated battery, rather than an attempted murder.
 

 | a A hearing was held on Defendant’s motion to suppress on February 28, 2008. The State’s first witness was Officer Mark Nappier of the MPD who testified that he assisted with the investigation of the murder. Officers learned from motel staff that Defendant and Mr. Murphy had been sharing a room at the motel, a notice was sent to all MPD officers to “be on the lookout” (BOLO) for Defendant because he was needed for questioning. Later that same afternoon, officers located Defendant and he accompanied them to the police station for questioning.
 

 The police interview with Defendant was recorded with audio and video equipment and relevant portions of the videotape were played for the trial judge during the hearing. Officer Nappier met with Defendant and explained that he was not under arrest. Defendant was then advised of his
 
 Miranda
 
 rights and signed a waiver of rights form. The waiver of rights form signed by Defendant also indicated that he was not under arrest, but was being questioned in relation to an offense. Detective Nappier explained during questioning that Defendant was being questioned in relation to the aggravated battery of Mr. Murphy. At the time Detective Nappier first questioned Defendant, Mr. Murphy was still alive in the hospital and in critical condition.
 

 At one point during the interview, Officer Nappier questioned Defendant about a prostitute that he claimed to have hired on the night Mr. Murphy was beaten. Defendant replied, “I think I need me a lawyer now. Because sir I’m not gone ... I’m not gone go into about what I did with this person or ...” Officer Nappier then clarified that he was not asking RDefendant what he did with the prostitute but, rather, how much money he had spent on her. At that point, Officer Rhodes interrupted the questioning and asked Defendant whether or not he wanted to continue the interview. Defendant did not respond clearly, so Officer Rhodes then stated, “... [Y]ou said something earlier ... you said I think I need a lawyer ... Do you want a lawyer?” Defendant replied that he did not want to give officers the details of his encounter with the prostitute and then stated, “I don’t need a lawyer cause I haven’t done anything.”
 

 As previously stated, after concluding the interview, Officer Nappier and the other officers provided Defendant with clothes and transported him to St. Francis Hospital to collect a DNA sample. Once they finished at the hospital, Detective Nappier dropped off Defendant in town.
 

 Detective Nappier testified that he did not have contact again with Defendant un
 
 *527
 
 til a warrant was issued for his arrest and officers located him in Dallas, Texas. In March 2007, Defendant was arrested at which time refused to talk to police or sign a waiver of rights form.
 

 [BThe State’s next witness was Officer Dawayne Crowder of the MPD. Officer Crowder testified that he saw Defendant walking through a private parking lot and stopped to talk to him. Once he began talking to Defendant, he recognized Defendant as the person described in the BOLO notice and asked Defendant if he would come to the station for questioning. Defendant agreed and Officer Crowder escorted Defendant to the police station, but did not ask him any questions or read him his
 
 Miranda
 
 rights at that time.
 

 The State’s next witness was Officer Thomas Rhodes of the MPD. Officer Rhodes generated the BOLO notice with Defendant’s image and pertinent information. Officer Rhodes met Defendant after he was escorted to the police station and witnessed him being apprised of his
 
 Miranda
 
 rights prior to the interview. Officer Rhodes testified that Defendant was told he was being questioned about an aggravated battery. He also corroborated Detective Nappier’s testimony that Defendant initially indicated that he may need a lawyer, but, after being asked to clarify, said he did not need a lawyer. Detective Rhodes also testified that Defendant was asked for his pants and his shoes near the end of the interview, but that it was clear he was not required to give them to the officers.
 

 The State then rested, Defendant did not present anything further and the trial judge denied the motion to suppress. The trial judge concluded that Defendant’s statements were intelligently and voluntarily made based on the totality of the circumstances. Defendant voluntarily came to the police station, was told he was not under arrest several times and was not in handcuffs during the interview. Defendant was advised of his
 
 Miranda
 
 rights prior to questioning and signed a waiver of rights form. There was no clear and unequivocal invocation of his right to an attorney. It was only when Defendant was asked about paying a prostitute money that he said, under his breath, that he may need a lawyer. When asked to clarify, Defendant said he did not need a lawyer because he had done nothing wrong.
 

 | fiThe interview room used by officers to interview Defendant was also used to interview witnesses and victims.. Additionally, Defendant’s attitude, as demonstrated on the video recording, indicated that Defendant was aware that he was not under arrest. Defendant answered the questions he wanted to answer and refused to answer those he did not want to answer.
 

 On August 9, 2010, the State filed notice of its intention to use Defendant’s statement at trial. The State additionally requested that Defendant be prohibited from mentioning the fact that he agreed to take a lie detector test during the interview because, when the test was actually offered, Defendant refused to take it. On August 10, 2010, following a hearing on the issues, the trial judge ruled that the State would be permitted to use Defendant’s statement at trial. Defendant agreed to the redaction of his statement agreeing to take a lie detector test.
 

 On May 27, 2010, Defendant filed a motion to quash which alleged that the State’s two-year time limitation to prosecute Defendant’s case had expired. On August 11, 2010, following jury selection, the trial judge denied Defendant’s motion to quash, concluding that the two-year time limitation had been suspended from running several times due to pending motions.
 

 
 *528
 
 After the trial court denied Defendant’s motion to quash, the trial began. The State called Cynthia Cole, a clerk at the Palms Motel, to testify as a witness. Ms. Cole remembered Mr. Murphy and Defendant. She testified that the two men stayed together in Room 38 on August 6, 2006, and in Room 25 from August 7-11, 2006. Ms. Cole recalled going into 17Room 25 when the housekeeper came to her office and reported that she saw a lot of blood in the room on the morning of August 11, 2006. Ms. Cole testified that, when she entered the room, she saw that the telephone was turned over and that a board was lying on the empty bed across from the bed Mr. Murphy was in. Mr. Murphy was lying on the other bed with one leg hanging off and his head was turned in an unnatural way, with the cover of the bed drawn up to his neck. Ms. Cole told an employee to call 911.
 

 Ms. Cole observed that the board appeared to have come from an outdoor area between the trash bin and a storage building which were on an island in the center of the motel. The motel staff stacked materials there that were used for motel repairs. Room 25 is located directly behind the storage building. Later in the trial, Ms. Cole testified that anyone attempting to get into one of the motel rooms would have to pass the front desk, which was attended 24 hours a day. The motel has no surveillance cameras.
 

 The State called as its next witness Annie Mae Jackson, a housekeeper at the Palms Motel. Ms. Jackson testified that, on the morning of August 11, 2006, she had stopped by Room 25 to collect the linen and there was no answer when she knocked on the door. Ms. Jackson opened the door a crack to make sure the room was vacant, but she saw someone lying in one of the beds, so she went on to the next room. When she came back some time later, she noticed that the person who had been lying in the bed, Mr. Murphy, had changed positions and was completely unresponsive. The bathroom door was closed as well. Ms. Jackson went and alerted her [ ¿manager, Ms. Cole, who came to the room to see if anything was wrong with Mr. Murphy. When Mr. Murphy proved completely unresponsive, Ms. Cole left to contact police and Ms. Jackson stayed with Mr. Murphy.
 

 Another witness for the State was Margo Mikeska, an expert in forensic serology and forensic DNA testing. Ms. Mikeska testified that she had performed DNA tests on the two pieces of the broken 2x4 board and compared her findings with known DNA samples from Defendant and Mr. Murphy. The smaller piece of the 2x4 board contained blood identified as Mr. Murphy’s and DNA identified as belonging to Defendant. There was also a weaker amount of DNA on the smaller piece of wood indicating another individual’s presence. Ms. Mikeska opined that, because the amount of DNA was so small, it could have been on the board a longer amount of time. The larger piece of wood contained only Mr. Murphy’s DNA.
 

 Brian Weston, a paramedic, also testified for the State. Mr. Weston testified that, on August 11, 2006, he was called to the Palms Motel because one of the guests was unconscious. When Mr. Weston arrived and entered Room 25, he saw Mr. Murphy lying on the bed, his feet were on the floor and blankets were tucked beneath his shoulders. He was unresponsive and bleeding from his head. Initially, Mr. Weston thought Mr. Murphy had been shot in the head, but then saw the broken 2x4 on the other bed. Mr. Weston and his partner placed Mr. Murphy on oxygen and rendered additional aid. Mr. Weston testified that Mr. Murphy was naked, had a Lblack left eye, was bleeding from his left
 
 *529
 
 ear and had a l]6-inch laceration on the back of his head.
 

 Officer Richard Jones of the MPD also testified for the State. Officer Jones took photographs of the crime scene, which were admitted into evidence. He stated that the 2x4, which had been broken into two pieces, looked “weathered.” The larger piece of the board was lying on the larger bed and the smaller piece was on the floor by the bed. Officer Jones further testified that there were no signs of a struggle, the furniture appeared unmoved and the window of the room did not appear to have been tampered with. Officer Jones stated that, since there were no signs of a forced entry, it was likely that the perpetrator “had been in the room legitimately.”
 

 The State’s next witness was Officer Nappier of the MPD. Officer Nappier testified that, on the morning of August 11, 2006, after helping paramedics get Mr. Murphy onto a stretcher, he learned from the motel office that Mr. Murphy and Defendant were sharing the room. He returned to the room to investigate the scene and found the 2x4 board lying on the larger bed. He also saw a blood stain on the floor and found a check stub for Mr. Murphy. After he finished investigating the scene, Officer Nappier went to the hospital to speak to Mr. Murphy. Mr. Murphy was unresponsive, but Officer Nappier was able to obtain a blood sample from him.
 

 Officer Nappier testified that Officer Rhodes prepared a BOLO for Defendant because he was registered for the same motel room as Mr. Murphy. Officer Nappier also testified as to the events leading up to | ^Defendant’s first police interview at the station. Defendant’s statement was then played for the jury, who was also provided with a written transcript of the interview.
 

 During the police interview, Officer Rhodes asked Defendant to explain what he did the night before Mr. Murphy was found. Defendant stated that he got off of work a little after 6:00 p.m., picked up his paycheck and went across the street with Mr. Murphy to cash their checks and buy beer. When they were finished, a coworker named Willie Cook, along with another coworker, took them both back to the Palms Motel. According to Defendant, Mr. Murphy told him that he was not going to go to work the next day, August 11, 2006.
 

 Defendant then stated that, after returning to the motel room, he drank some beer and went to a nearby laundromat to wash his and some of Mr. Murphy’s clothes while Mr. Murphy went to a grocery store to buy food. Defendant said he spoke with an acquaintance who was going to an Alcoholics Anonymous meeting before going to the laundromat and that he was unsure as to what time he returned from the laundromat. He refused to try to estimate a certain time of return. During the interview, Defendant also claimed that he used to be a police officer in New York City.
 

 Defendant stated that, when he and Mr. Murphy returned to the motel room, they ate dinner and Defendant left again around 10:30 p.m. “looking for some fun.” Defendant stated that he met up with a girl named “Adrian Jackson” and the two of them returned to the motel room around midnight and woke up Mr. Murphy. Defendant and Adrian only stayed for h ,30 minutes because Mr. Murphy wanted to go back to sleep. According to Defendant, Mr. Murphy had been drinking liquor and smoking cigarettes.
 

 Defendant then stated that he took Adrian to her friend’s house, which he referred to as “a little pot house.” Defen
 
 *530
 
 dant and Adrian stayed there for a while, but then returned to the motel room. Defendant stated that Mr. Murphy had the only key to the room and unlocked the door to let him in once he returned. Defendant said that he and Mr. Murphy watched a western on TV and talked for a little while, but that he left the motel room around 2:30 a.m. to meet up with Adrian again. Defendant stated that Mr. Murphy told him once again that he was going to miss work the following morning on August 11, 2006.
 

 Defendant stated that, when he left the motel and met up with Adrian again at her friend’s house, he “bought everything she wanted.” Defendant paid $15 for a room at the house, bought Adrian some “stuff’ and bought himself a beer. Defendant refused to say what he did with Adrian in the bedroom, but said that he stayed there with her until 8:30 or 9:30 a.m. that morning. Defendant further refused to disclose the location of the “crack house.”
 

 Defendant said that he could not buy Adrian much “stuff’ because he only had $50 when he went to the house with her. He had no money left at the time he spoke to the officers. Defendant stated that he left the crack house around 9:00 a.m. He went to Willie Cook’s house to fix his car and make some money, but did not do so because Willie could not pay him. Defendant then stated that he went back to the crack house where he stayed |1Pfor three more hours. He then left the crack house and began walking down Pine Street to go to his friend, Carlos’s, house to detail cars.
 

 Officer Rhodes then questioned Defendant as to where he spent the money he had earned the previous day. Defendant stated that his paycheck was for $132. He first paid Mr. Murphy $40 that he owed to him and then he paid $2 to get the laundry washed and dried, bought his beer and cigarettes and bought a $50 money order, which he mailed home to Mer Rouge. Officer Rhodes then questioned Defendant as to where he got the remaining money to buy beer, drugs and the prostitute, and Defendant said that he had received an additional check for $30.
 

 Officer Rhodes asked Defendant why he went back to the crack house after he left Willie’s house if he had no money and Defendant replied that he had gotten $15 from Mr. Murphy when he went back to the motel room at 1:30 a.m. Defendant said that the last time he saw Mr. Murphy was at 2:30 a.m. Defendant allowed the officers to take his pants and shoes and have them tested for blood, the interview was concluded, officers took Defendant to St. Francis Hospital for a DNA test and then dropped him off in town.
 

 The State’s next witness was Dr. Frank Peretti, the forensic pathologist who performed Mr. Murphy’s autopsy. Dr. Peret-ti testified that, when Mr. Murphy was admitted to the hospital, he tested negative for drugs and alcohol. He had two black eyes as a result of fractures at the base of his skull. Dr. Peretti diagnosed Mr. Murphy as having suffered cranial cerebral trauma, facial lacerations and abrasions and three skull fractures. Dr. Peretti |1sopined that Mr. Murphy’s injuries, which were the result of blunt force trauma, most likely came from contact with a flat, broad surface, like a piece of wood. Mr. Murphy also had a rug burn on his shoulder. Dr. Peretti opined that the 2x4 board found at the motel room could have caused Mr. Murphy’s injuries and that, given the nature of the largest skull fracture, it was possible that the 2x4 could have broken from the blow. Dr. Peretti concluded that, if Mr. Murphy not been taken off of life support, he would have been in a vegetative state for the remainder of his life and would have eventually died from his injuries.
 

 
 *531
 
 Later in the trial, the State recalled Officer Nappier to testify. Officer Nappier stated that, after the interview was over and Defendant was released, he went back to the station to see if he could locate “Adrian Jackson,” but the detectives were unable to find her.
 

 Officer Nappier confirmed that Defendant had cashed a check for $130.71 and that Mr. Murphy had cashed a check for $121.47 on August 10, 2006. Officer Nappier also confirmed that Defendant and Mr. Murphy worked as temporary labor employees and that they were both scheduled to work on August 11, 2006. This information was corroborated by the custodian of records at Labor Finders.
 

 Marcus Manning, an employee of Apple-gate Insulation, also testified for the State. Mr. Manning testified that Applegate hired Defendant and Mr. Murphy from Labor Finders and that both men were scheduled to work August 11, 2006, but neither showed up.
 

 114The State’s next witness was Willie Cook, an employee of Labor Finders. Cook verified that, on August 10, 2006, he drove Defendant and Mr. Murphy to a store, where they cashed their paychecks, and then he dropped them back off at the Palms Motel. Cook testified that he returned to the motel on Friday morning to pick up Mr. Murphy and Defendant for work, but no one answered the door when he knocked.
 

 The State also called James Holland to testify. Holland testified that he worked with Mr. Murphy and Defendant at Labor Finders. He stated that Mr. Murphy was a hard worker and never missed work. Holland further testified that he went with Mr. Murphy and Defendant to cash their checks. Mr. Murphy bought beer and cigarettes and told Holland that he had $180 left after making his purchases.
 

 The State called Officer Rhodes of the MPD as its next witness. Officer Rhodes corroborated the testimony of Officer Nappier with regard to the fact that police could not locate “Adrian Jackson.” Following officer Rhodes’ testimony, both the State and Defendant rested.
 

 As previously stated, on August 13, 2010, the jury found Defendant guilty as charged of second degree murder. On August 25, 2010, Defendant waived the preparation of a presentence investigation report and waived the recitation of the trial court’s reasons for sentencing under La. C. Cr. P. art. 894.1. Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. Defendant now appeals his conviction.
 

 \ ^DISCUSSION
 

 Assignment of Error Number One (verbatim):
 
 The evidence adduced at trial was insufficient to convict Theodore Moore of second degree murder.
 

 In his first assignment of error, Defendant contends that the evidence presented at trial was insufficient to support his second degree murder conviction. In support of this assertion, Defendant points out that there were no eyewitnesses linking him to the murder, that the only physical evidence was DNA found on the 2x4 board, that a third person’s DNA was found on the board and that his pants and shoes which were taken by police had tested negative for blood. Defendant further claims that the State failed to exclude every reasonable hypothesis of innocence, including his story that he was with a prostitute when Mr. Murphy was being beaten. We disagree.
 

 The criterion for evaluating sufficiency of evidence is whether, upon viewing the evidence in a light most favorable
 
 *532
 
 to the prosecution, any rational trier of fact could have found all the elements of the crime proved beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Gray,
 
 26,115 (La.App.2d Cir.6/22/94), 639 So.2d 421. This standard, now legislatively embodied in La. C. Cr. P. art. 821, is applicable to eases involving direct and circumstantial evidence.
 
 State v. Charleston,
 
 33,393 (La.App.2d Cir.6/23/00), 764 So.2d 322,
 
 writ denied,
 
 00-2603 (La.9/14/01), 796 So.2d 672.
 

 Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue.
 
 State v. Turner,
 
 591 So.2d 391 (La.App. 2d Cir.1991),
 
 unit denied,
 
 16597 So.2d 1027 (La.1992). Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 State v. Major,
 
 604 So.2d 137 (La.App. 2d Cir.1992),
 
 writ denied,
 
 609 So.2d 255 (La.1992).
 

 In order to convict using circumstantial evidence, every reasonable hypothesis of innocence must be excluded. La. R.S. 15:438;
 
 State v. Charleston, supra.
 
 The circumstantial evidence provision set forth in La. R.S. 15:438 does not establish a stricter standard of review than the more general
 
 Jackson v. Virginia, supra,
 
 formula, but a hypothesis of innocence that is sufficiently reasonable and strong must necessarily lead a rational fact finder to entertain a reasonable doubt as to guilt.
 
 State v. Charleston, supra.
 
 Whether circumstantial evidence excludes every reasonable hypothesis of innocence is a question of law.
 
 Id.
 
 Ultimately, all evidence, whether direct or circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 State v. Charleston, supra.
 

 La. R.S. 14:30.1 provides, in pertinent part:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or inflict great bodily harm; or
 

 |17(2) When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery, first degree robbery ... [or] simple robbery ... even though he has no intent to kill or to inflict great bodily harm.
 

 Viewing the evidence in the light most favorable to the State, the evidence presented at trial clearly supported Defendant’s second degree murder conviction.
 
 Jackson, supra.
 
 While there was no direct evidence from eyewitnesses linking Defendant to the murder, the circumstantial evidence adduced at trial excluded any reasonable hypothesis of Defendant’s innocence. La. R.S. 15:438;
 
 State v. Charleston, supra.
 

 As pointed out by the State, Defendant had the motive, the opportunity and the means to kill Mr. Murphy. Defendant’s motive was needing more money to buy drugs and services from the prostitute. Officer Rhodes attempted to track down Defendant’s alibi, “Adrian Jackson,” but could not locate her. Furthermore, even if Adrian could have confirmed that she was with Defendant on the evening of August 10, 2006, Defendant, by his own admission, told police that he was in and out of the motel room several times that night. Defendant could provide no explanation of why he left Adrian to go back to the motel at 1:30 a.m.
 

 
 *533
 
 Defendant’s assertion that he had plenty of money for his activities on the evening of August 10 and morning of August 11 is unreasonable. During the interview, Defendant claimed expenses adding up to $107 which left him with less than $60 to buy several items, including drugs, “everything [the prostitute] wanted,” and the services provided by the prostitute. Defendant realized midway through the interview that he did not have adequate funds accounted for to pay for his activities, so he suddenly | isclaimed that he remembered borrowing money from Mr. Murphy when he returned to the motel room at 1:80 a.m.
 

 The most damaging piece of circumstantial evidence leading to the inference that Defendant murdered Mr. Murphy was the fact that Defendant’s DNA was found on the smaller piece of the 2x4 board which also containing Mr. Murphy’s DNA. Defendant shared the motel room with Mr. Murphy for several days and would have known where to find the 2x4 board. Ms. Cole, the motel clerk, testified that the broken 2x4 board appeared to have come from a stack of construction materials located just outside Defendant’s and Mr. Murphy’s motel room.
 

 Defendant contends that the DNA was somehow transferred from his bed to the broken piece of 2x4; however, the broken piece of 2x4 containing his DNA was found on the floor between the beds, not on Defendant’s bed. We conclude that all hypotheses of innocence set forth by Defendant during his trial were reasonably rejected by the jury.
 

 Accordingly, this assignment is without merit.
 

 Assignment of Error Number Two (verbatim):
 
 The Trial Court erred in denying Mr. Moore’s motion to suppress his statement.
 

 In his second assignment of error, Defendant contends that the trial judge erred in denying his motion to suppress his statement to police. Specifically, Defendant complains that, while he was in custody and being interviewed, police failed to honor his request for an attorney, took his shoes and pants and told him he was being questioned about an aggravated battery when the crime was considered by police to be an attempted murder.
 

 liflThe prophylactic safeguards of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply only to custodial interrogation. To determine whether someone is in custody, the court must first make an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint of freedom to the degree associated with a formal arrest.
 
 Stansbury v. California,
 
 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994);
 
 State v. Blank,
 
 04-0204 (La.4/11/07), 955 So.2d 90,
 
 cert. denied,
 
 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). Second, the court must evaluate how a reasonable person in the position of the interviewee would have gauged the breadth of his freedom of action.
 
 Stansbury v. California, supra; State v. Blank, supra.
 

 In order for the State to introduce a defendant’s statement into the record, it must demonstrate that the statement was freely and voluntarily made and not the product of fear, duress, intimidation, menace, threats, inducements or promises.
 
 State v. Holmes,
 
 06-2988 (La.12/2/08), 5 So.3d 42,
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). When a person has been arrested or detained, the police must advise him of his
 
 Miranda
 
 rights, including the reason for his arrest or detention. La. C. Cr. P. art. 218.1. The State is not required to inform a defendant that he is an attempted murder
 
 *534
 
 suspect for his execution of a waiver of rights to be considered knowing and voluntary.
 
 Patterson v. Illinois,
 
 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988);
 
 State v. Holmes, supra. Miranda
 
 warnings alone sufficiently apprise the defendant of his Sixth lenAmendment right to counsel and of the consequences of abandoning that right; no additional or refined warnings are needed in this context.
 
 Patterson v. Illinois, supra; State v. Holmes, supra.
 

 A trial judge’s finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless the evidence fails to support the trial judge’s determination.
 
 State v. Holmes, supra.
 
 When deciding whether a statement is free and voluntary, a court should consider the totality of the circumstances under which it is made.
 
 Id.
 

 The determination of whether the accused actually invoked his right to counsel is an objective inquiry.
 
 Davis v. United States.,
 
 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994);
 
 State v. Cooper,
 
 36,830 (La.App.2d Cir.3/5/03), 839 So.2d 995,
 
 unit denied,
 
 03-0999 (La.10/10/03), 855 So.2d 330. Invocation of the
 
 Miranda
 
 right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.”
 
 Davis v. United States., supra; State v. Cooper, supra.
 
 If a defendant makes a reference to an attorney that is ambiguous or equivocal in that a reasonable, police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, cessation of questioning is not required.
 
 Davis v. United, States, supra; State v. Cooper, supra.
 
 A suspect must “unambiguously request” counsel “sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney” in order to cease custodial questioning.
 
 Davis v. United States, supra; State v. Cooper, supra.
 

 _[¿jln the case
 
 sub judice,
 
 we find that the evidence supports the trial judge’s determination that Defendant’s statement was freely and voluntarily given. The evidence adduced at the hearing demonstrated that Defendant was not in custody at the time he gave his statement. Defendant voluntarily rode with a patrol officer to the police station for questioning, was never placed in handcuffs, was told on several occasions that he was not under arrest, answered the questions he wanted to and refused to answer the questions he did not want to answer during the interview.
 

 An objective assessment of the circumstances surrounding Defendant’s police interview indicates that he was not under formal arrest, nor was his freedom restrained to the degree associated with a formal arrest.
 
 Stansbury v. California, supra; State v. Blank, supra.
 
 Defendant was fully informed of his
 
 Miranda
 
 rights and signed a waiver of those rights before he was interviewed. The transcript of his interview reveals that his statement was not the product of fear, duress, intimidation, menace, threats, inducements or promises. Officers asked Defendant if they could have his pants and shoes for testing and Defendant agreed, voluntarily gave the items to officers and was provided with alternative clothing to wear.
 

 Furthermore, although Defendant complains that he was only told by police that he was being interviewed about an aggravated battery, officers were not required to tell Defendant that he was suspected of attempted murder for his waiver of
 
 Miranda
 
 rights to be considered knowing and voluntary.
 
 Patterson v. Illinois,
 
 
 *535
 

 supra; State v. Holmes, supra.
 
 Additionally, given the circumstances, a reasonable person in the position of | ^Defendant would not have believed he was under arrest.
 
 Stansbury v. California, supra; State v. Blank, supra.
 

 Further, Defendant failed to unequivocally invoke his right to counsel during the interview. When questioned about his activities with a prostitute on the evening of August 10 and the morning of August 11, Defendant told officers that he was not going to incriminate himself. When further pressed about how much he paid the prostitute, Defendant replied that he may need a lawyer because he did not want to discuss what he did with the prostitute. When Officer Rhodes asked Defendant to clarify whether or not he wanted to stop the interview and speak with an attorney, however, Defendant responded that he did not need a lawyer because he had not done anything.
 

 Defendant’s initial request for an attorney was not unambiguous or unequivocal. Defendant was simply making the point to officers that he did not want to talk about what he did with the prostitute. Moreover, Defendant withdrew the request almost immediately so that he could continue the interview in an attempt to exculpate himself. Accordingly, we find that Defendant’s statement was properly admitted into evidence by the trial judge.
 
 State v. Cooper, supra.
 

 This assignment is without merit.
 

 CONCLUSION
 

 For the foregoing reasons, the conviction of Defendant, Theodore Roosevelt Moore, is affirmed.
 

 AFFIRMED.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).