CARAWAY, J.
|T Following a jury trial, Gerald Tatum was convicted of armed robbery, in violation of La. R.S. 14:64. The defendant admitted being a second felony offender and was sentenced to 55 years at hard labor without benefit of probation, parole, or suspension of sentence. Tatum appeals his conviction and sentence. We affirm.

Facts

On December 22, 2010, two masked men entered the Family Dollar Store in Columbia, Louisiana, and robbed the store manager and assistant manager of $2600. One of the men was armed with a gun and entered the manager’s office, held a gun to her cheek and demanded that she open the store safe. After this robber took money (both coins and bills) and bags from the safe, the other man also took money from the cash register. The men obtained a trash bag for the money from the employees and fled the store.
When deputies arrived at the store immediately after the robbery, they began searching outside for the two masked men and instead found rolls of change on the ground that began a money trail which ran through a field near the store, leading to a house. A stocking cap was also found on the trail and money was located under an opening in the front of the house. Upon entering the house, officers saw money on the floor and found one individual in a back bedroom lying on a bed. Garbage and moneybags were found under a pile of clothing in the room. When officers lifted the mattress off the bed, they found Gerald Tatum lying on the floor looking up. Next to Tatum was a moneybag with loose money beside it as well as a black head wrap.
LTatum was arrested and found guilty by the jury of armed robbery. He was adjudicated a second felony offender and received a sentence of 55 years at hard labor without benefit of parole, probation or suspension of sentence. After the trial court denied an oral motion to reconsider sentence, this appeal ensued.

Discussion

Tatum argues that because the victims were unable to identify the robbers and circumstantial evidence was presented, the state failed to exclude every reasonable hypothesis of innocence and negate the reasonable probability of misidentification.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Dorsey, 10-0216 (La.9/7/11), 74 So.3d 603, cert denied, — U.S. -, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates, “assuming every fact |3to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” State v. Dorsey, *553 supra. This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. State v. Dorsey, supra; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. Rather, all of the evidence, both direct and circumstantial, must be sufficient under Jackson to convince a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Dorsey, supra.
In cases where the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Dorsey, supra; State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Shell, 46,983 (La.App.2d Cir.3/7/12), 87 So.3d 934; State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Shell, supra; State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753.
UCircumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La.1985); State v. Jones, 46,-758 (La.App.2d Cir.12/14/11), 81 So.3d 236, writ denied, 12-0147 (La.5/4/12), 88 So.3d 462.
In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. As an evidentiary rule, it restrains the fact finder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Moore, 46,-252 (La.App.2d Cir.5/18/11), 69 So.3d 523, writ denied, 11-1260 (La.12/2/11), 76 So.3d 1175.
The evidence presented at trial included the testimony of the two victims. Michelle Dilley, an assistant manager, testified that she and Wendy Taylor, the store manager, were working in the store at about 7:40 p.m. when two masked men entered the store and said “put your hands up.” Dil-ley could not give much of a physical description of the men because she was unable to see their faces, but she recalled that one man was shorter than the other. She also recalled that one of the robbers wore a ski mask and that the other one who stayed with her wore a “do-rag” over his head with holes cut out for eyes. Dil-ley identified the two masks shown to her and introduced into evidence as being those worn by the robbers. Dilley also recalled that |sboth men wore black ski hats and were dressed in “solid black” clothing. She remembered that one of the men wore a hooded black jogging sweater that zipped up.
The man who stayed with Dilley did not have a gun and told her “It’s gonna be okay, Michelle.” He then told her to go to the register, and Dilley complied. She took money from the register and placed it *554 in a black trash bag obtained from the store; the men then fled. Dilley identified several of the bags that were taken from the store by the robbers including the black trash bag she placed the money from the register in as the robbers were leaving the store. Dilley testified she recognized the bag because it was “real flimsy and it was mainly like the dollar trash bags you get at our Dollar Store and you could tell it was already ripping.”
Dilley testified that she believed the shorter of the two men was approximately 5'8" or 5'9". During Dilley’s testimony, Tatum was asked to stand, while the witness viewed his physical appearance. Dil-ley observed that the defendant’s height and weight were consistent with that of the taller man who robbed the store.
Taylor testified she was the store manager at Family Dollar. Taylor was in the office talking to her husband on the phone when she heard the bell sound indicating someone was entering the store. As she looked up, she saw two men running toward her. Taylor testified that the taller of the two men stepped into her office and “asked me to hand him the money.” Taylor got the key from Dilley and opened the safe while the masked robber “had the gun in my, in my cheek.”
IfiOnce the safe was open, Taylor moved aside and the robber took money, bills and coins, as well as several bags including a deposit bag, a bag the store used for petty cash, and a moneybag with a zip lock. She identified those bags introduced into evidence as coming from her store. Taylor calculated approximately $2,600 was stolen from the store and $1,922 of that was recovered and returned. Once the men left the store, Taylor called for help and was told that assistance was already on the way because her husband immediately called the police after his call with her.
Taylor testified she saw only one gun, “a forty-five (.45)” revolver, that night and the taller of the robbers had the gun. When asked if Tatum was similar in physical stature to either of the robbers, Taylor indicated that she believed the taller robber was taller and skinnier than Tatum. Taylor testified she did not recall if Tatum was the taller or shorter of the men who entered the store and she had not paid much attention to the man who remained with Dilley while he was in the store. When asked about Donald Jones,[1] Taylor reported that she knew Jones since he shopped in Family Dollar. Taylor stated she did not believe that Jones could be one of the robbers because he was “more broader than the suspect was.”
Deputy Jessie Morris testified he was called in as backup to the Family Dollar armed robbery investigation and was asked to search around the area. Morris walked through a field near the store where he located a stocking cap and some cash. Morris identified the stocking cap he found on the trail and it |7was introduced into evidence. As he continued further up the trail, Morris testified he found more cash.
Deputy Matt Schulte testified that once he arrived on the scene, he was advised that the suspects exited through the south corner of the building. Deputy Schulte went around the corner of the building where he observed the rolls of change that had been found on the ground. From there, Deputies Schulte and Morris walked toward Leslie Street where they observed more change on the ground. As they continued on the trail, they found yet another *555 pile of change and bills. Deputy Morris stayed with the money to secure the evidence as Deputy Schulte and another officer continued finding money along the trail that led to a house.
A short distance from the house, Deputy Schulte saw a male and female leaving the house and walking in his direction. Deputy Schulte and the other officer waited until the couple reached them at which time they identified themselves. The man identified himself as Donald Jones. Deputy Schulte testified he explained to Jones the situation and what the police were doing in the area. Deputy Schulte told Jones there was money leading to the residence. Jones said no one was in the house, although Deputy Schulte had just seen him leaving. Jones gave Deputy Schulte consent to search the house and walked the deputies through the house, opening curtains that were covering most of the doorways. In one room in the back of the house, Deputy Schulte saw a light. When Deputy Schulte looked into the room, he could see “feet and legs” on a bed. Deputy Schulte asked Jones again if | ^anyone was in the house, and he said no.[2] Deputy Schulte informed another deputy of his observation, so they moved Jones out of the way and entered the room. There they found a suspect[3] lying on the bed in the room.
Deputy Blake Wyles testified he arrived at the house shortly after the first suspect had been removed from the room. Deputy Wyles stated he initially searched outside the house where various denominations of “paper money” were found by the skirting of the house. Deputy Wyles observed money on the ground from outside an opening in the skirting to a few feet under the house but found no weapons.
Once Deputy Wyles completed his assignment outside the house, he went inside and began searching. Deputy Wyles testified he went into the room where the suspect had been discovered. As a part of the search, Deputy Wyles lifted the mattress and saw through the springs, a person lying on the floor under the bed -with a moneybag next to him and loose bills on the floor. Deputy Wyles dropped the mattress, drew his weapon and ordered the man out from under the bed. In open court during the trial, Deputy Wyles identified the man he found under the bed as Tatum. Tatum was found under the bed dressed in a white t-shirt and dark colored jeans.
Detective Sedric Meredith testified he was responsible for photographing all of the evidence collected during the investigation of the armed robbery. He identified photographs of change and bills taken near the Family Dollar, the immediate vicinity or parking lot and pictures of money |gfound near a building in the immediate vicinity of the store. Detective Meredith testified that the locations of the pictures were “progressive” as they moved from the store out to the final destination of the house where the suspects were found.
Detective Meredith testified that he also took photographs once he reached the house. He photographed the money and evidence found under the house, as well as evidence found inside the house, including bills on the floor in the house, black coveralls found in a front room, “sweats” in a back room and clothing found on the bed. Detective Meredith took photographs of the garbage bag and moneybag he found hidden under a pile of clothing in the back bedroom where Tatum was found. Also photographed were the two moneybags, a *556 large sum of money and a scarf or “black head wrap” found under the bed.
Based on the testimony of the witnesses and the evidence, when viewed in the light most favorable to the state, sufficient evidence exists for the jury to conclude that Tatum was one of the two men who entered the Family Dollar and robbed the employees of $2,600 while armed with a gun. Taylor’s testimony was that she knew it was not Jones who participated in the robbery, precluding his participation in the robbery. The jury obviously chose her testimony as credible. Moreover, there was the short time sequence that led to the discovery of the clothing, trash and moneybags. The money trail, which began just outside the store and continued to the nearby house, led to the two men including Tatum found hiding under the bed next to the stolen cash. From this evidence, the jury could have reasonably 1 ^concluded, to the exclusion of any other reasonable hypothesis of innocence, that it was Tatum who participated as a principal to the armed robbery. For these reasons, Tatum’s arguments of misidentification and failure to exclude any other reasonable hypothesis of innocence are without merit.
Tatum also complains that the imposed sentence is excessive in that it is potentially a life sentence which is not proportional to the two offenses underlying his habitual offender punishment. Tatum argues that because a possibility exists for his rehabilitation and his becoming a productive member of society, the minimum sentence of 49 1/2 years is appropriate.[4]
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Watson, 46,572 (La.App.2d Cir.9/21/11), 73 So.3d 471. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.08/13/08), 989 So.2d 267, writ denied, 08-2697 (La.09/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.08/13/08), 989 So.2d 259, writ denied, 08-2341 (La.05/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Taves, 03-0518 (La.12/3/03), 861 So.2d 144; State v. Caldwell, 46,718 (La.App.2d Cir.11/2/11), 78 So.3d 799.
The second portion of the sentence requires that a determination be made regarding the constitutional excessiveness of a sentence. A sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. *557 Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Washington, 46,568 (La.App.2d Cir.9/21/11), 73 So.3d 440, writ denied, 11-2305 (La.4/27/12), 86 So.3d 625.
The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his Indiscretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Diaz, 46,750 (La.App.2d Cir.12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams, supra; State v. Free, 46,894 (La.App.2d Cir.1/25/12), 86 So.3d 29.
Following Tatum’s admission to the second felony habitual offender bill of information and sentencing, the trial judge noted his review of the 894.1 factors, finding that there was a great risk of death or harm and that force and a dangerous weapon were used against two women. The trial judge also considered that Tatum was on probation at the time of the commission of the crime and had numerous misdemeanor convictions which evidenced a “history of disregarding the rights of others, both their property and their person.” The trial judge also examined a letter from one of the store employees and a statement from Tatum.
After considering these facts, the trial judge imposed the 55-year sentence. Tatum’s counsel immediately moved for reconsideration of sentence. The trial judge indicated he would give counsel some time to supplement the oral motion with additional factors the trial court should consider. A hearing was held on September 13, 2011, and counsel argued that the trial court should consider the mitigating factors including the defendant’s family life and his childhood. The defense also argued that the evidence failed to show that Tatum was the aggressive individual during the |TSrobbery and requested Tatum’s sentence be reduced to the minimum sentence of 49 ½ years. The trial court rejected Tatum’s arguments.
The record demonstrates adequate 894.1 compliance by the trial court. Likewise, we do not find constitutional error in the imposed sentence. Tatum’s sentence of 55 years’ imprisonment at hard labor without benefit of parole, probation or suspension of sentence is in the lower range of sentences for a second felony offender. Considering the facts of the instant case as well as Tatum’s criminal history, there is ample justification for imposition of this sentence. Tatum has an extensive misdemeanor criminal record including numerous charges for possession of marijuana and battery. His latest two offenses involved serious drug activity and a crime of violence. Tatum has been given ample opportunity for rehabilitation but persisted in criminal activity even while on probation. The present offense demonstrated a continued disregard for the lives and property of others. Therefore, considering this defendant, the crime, and the harm done to society, we find this sentence appropriately tailored to this defendant.
This assignment of error is without merit.

*558
Decree

For the foregoing reasons, Tatum’s conviction and sentence are affirmed.
AFFIRMED.

. Donald Jones was the individual that police later found leaving the house where Tatum was discovered.

. Jones was also placed under arrest for being an accessory to the crime after the fact.

. The suspect, later identified as Sterling Robinson, was also arrested for armed robbery.

. Tatum argues that even the statutorily mandated minimum sentence of 49 ½ years is constitutionally excessive. However, this issue which was not raised in the trial court is not properly before us for review.