**COURT OF APPEAL, THIRD CIRCUIT**
**KA 06-191**

**STATE OF LOUISIANA**

**VERSUS**

**DARNELL SAVOY**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 04-K-5145-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN D. SAUNDERS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese,
Judges.

**AFFIRMED.**

**Earl B. Taylor**
**District Attorney**
**Alisa Ardoin Gothreaux**
**Assistant District Attorney**
**27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-3041**
**Counsel for Plaintiff:**
**State of Louisiana**

**Jason Wayne Robideaux**
**Attorney at Law**
**1005 Lafayette Street**
**Lafayette, LA 70501**
**(337) 291-9444**
**Counsel for Defendant:**
**Darnell Savoy**

**SAUNDERS, Judge.**

On January 14, 2005, Darnell Savoy was indicted by a grand jury for two counts of second degree murder, a violation of La.R.S. 14:30.1.

On November 16, 2005, following a bench trial, the trial court found Defendant guilty as charged. On that same date, Defendant waived the delay in sentencing, and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for each count.

On November 16, 2005, following the issuance of the verdict and the imposition of sentence, Defendant made an oral motion for appeal and subsequently filed a written motion for appeal. In his appeal, Defendant alleges that the evidence was not sufficient to convict him of the offense of second degree murder. For the following reasons, we affirm Defendant's conviction.

## FACTS:

On November 21, 2004, Defendant had an altercation with several individuals, including Damien "Ed" Richard and Mark Keys, at a night club in Opelousas. After the fight in the club was broken up by police, Richard and Keys, along with several other individuals, went to the home of Roy Berry. Later in the evening, gunshots were fired in the direction of Berry's house, killing Felicia Comeaux and Roy Berry.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR:

In his appeal, Defendant asserts that the evidence was not sufficient to sustain his conviction of second degree murder.

The elements of second degree murder are set forth in La.R.S. 14:30.1, which provides, in pertinent part: "Second degree murder is the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm"

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

At trial, twelve witnesses provided testimony; seven of those witnesses were present at the scene when the events in question occurred.

Vincent Thomas testified that he was at Roy Berry's home on the night in question, along with Mark Keys, Chris Baker, Desmond Lastrapes, Damien Richard, Darryl Lewis, Roy Berry, and Henry Berry. The group left the Berry residence and went to Added Attraction, a nearby night club. While at the club, Damien Richard and Mark Keys got into an altercation with Defendant. Police entered the night club and used mace to break up the fight.

2

After leaving the club, Thomas returned to Berry's house, along with Keys, Richard, Lewis, and Lastrapes. Two women, Felicia Comeaux and LaShonda Papillion, also returned to Berry's home.

When Thomas returned to the Berry residence, he sat with Roy Berry on the porch. The two women who accompanied the group were sitting on the hood of Thomas' car, which was parked in the driveway at the side of the house, facing the backyard. Keys, Richard and Lewis were all in the back yard. Chris Baker, another friend, arrived in his car, and began talking to the two women. Thomas testified that he saw Kevin Coleman pass by the house in his distinctive "candy apple red" Cadillac and then went to the back yard. He testified that Coleman was the only person in the car.

After he reached the backyard, he heard gunshots. At that time, Keys, Lewis, and Richard, were with him in the backyard. None of them were armed; however, a shotgun was in the house. When the first shots were fired, Thomas stated that he "peeped and stayed back behind the house." He testified that he "looked around" and saw "some fire coming through the gate" of a wooden fence across the street.

At that point, Roy Berry ran to the backyard, saying that he had been hit. Berry was not armed at the time. Thomas then called emergency personnel. Thomas testified that the others went around to the front of the house after Berry came to the backyard. He stated that he never armed himself, nor did he fire any shots. He saw Keys retrieve the shotgun from inside the house. However, he did not see anyone fire any shots.

When he returned to the front of the house, Thomas saw Ms. Comeaux lying on the ground in front of his car and Ms. Papillion ducking down in front of it. When he approached Ms. Comeaux, he noticed that there was blood behind her head.

Thomas testified that he did not see Coleman's red car again, nor did he see Defendant in the area when the shooting occurred. Thomas was asked whether Berry could have been shot by any of the persons gathered in his backyard. He stated that it was not possible because they did not shoot until after Berry had been hit, and that they were shooting across the street.

Following the events, Thomas provided a handwritten statement to police. He testified that he told the police everything he had seen, and that the investigating officer wrote the statement, and he signed it. Although he indicated, in his statement to the police, that he had seen Keys and Coleman exchange words, Thomas testified that he had meant to say that Keys exchanged words with Defendant, rather than with Coleman. Thomas' statement to police did not include any information about a fight at the club. However, he stated that his memory could have been affected because he had been drinking on the night of the shooting. He further stated that earlier in the evening, at the club, Defendant was fighting with Keys, but mostly with Richard.

Mark Keys was also present at the night club and at the Berry residence on the evening in question. He testified that while at the club, he became involved in an altercation with Defendant, known better to him as "Putt." He stated that he had had an ongoing "argument" with Defendant, but that initially, Defendant began to fight with Damien Richard. Keys stated that Defendant was hitting Richard in the head with a gun. The fight ended with the arrival of police, and Defendant ran out of the club. Keys testified that he saw Defendant leave the club in a "greenish" Expedition.

4

Upon leaving the club, Keys returned to Berry's home, along with the other members of the group. While standing in the backyard with Lewis, he saw Coleman drive by the house in his Cadillac. He testified that Coleman was the sole occupant of the vehicle. From where he was standing, Keys could see Ms. Comeaux standing in front of Thomas' car in the driveway, facing the backyard and talking with Ms. Papillion. At the time, Roy Berry was sitting alone on the front porch.

A few minutes after Coleman passed, Keys stated that he heard shots fired. He testified that he saw the gunfire from two guns coming from the gate across the street. The two women dropped down between the cars, and he ducked behind the house. He then looked to see where the shots came from; he testified that they came from over and between the gate across the street. He further testified that Defendant was shooting from the gate; he could identify him because he recognized the white shirt and cap worn by Defendant earlier that evening in the club.

Keys testified that, at that point, he ran into the house to get a shotgun and some shells, and then went to the back of the house to load the weapon. He then ran to shoot, but not before Berry ran around the house, saying that he had been hit. Keys stated that he did not fire the first shot until he reached the trailer park across the street from the Berry house and that he did not fire any shots from the Berry house side of the street.

Before shooting, Keys saw Defendant, Coleman, and an unidentified third person running back to a car. He fired at the car three times, but did not hit it. He stated that he, Lewis, and Richard were the only persons to return fire from the trailer park. The car then left the trailer park, and he ran back across the street. When Keys

5

returned to the house, he went to check on Berry. Upon returning, he tried to throw the gun under the house, but it was later found by police.

Following the events, Keys gave a statement to police. At trial, he testified that he signed the statement without reading it. His statement indicates that he told police that he was in the night club with Lewis, Lastrapes, Baker, and Thomas when they "exchanged words with the Defendant and Coleman." At trial, Keys testified that he did not tell police that Coleman was present at the club when the fighting started. He further denied having made the statement that was read to him in court.

In addition to the initial statement he provided on November 21, 2005, Keys testified that he gave another statement to the police on December 1, 2005, in which he stated that he saw Defendant shoot toward Berry's house, and then get into the car with Coleman.

At trial, Darryl Lewis also testified. He stated that he has known Defendant for a long time, and that he was also friends with Coleman. On the night in question, he parked his car at Berry's home and walked to the night club by himself. At the club, he saw Defendant fighting with Richard, and also saw Defendant strike Richard with a gun. When police arrived to break up the fight, he left the night club.

After leaving the club, Lewis returned to Berry's house, where he talked with Berry and Thomas, who were sitting on the front porch. He recalled that the two women were sitting on the cars and facing the backyard. He saw Coleman's car pass by, but he stated that he had not seen Coleman at the night club. He then went into the backyard; he was in the back of the house when the shots were fired. Lewis stated that he was not armed at the time, but that he had a gun in his car. When the shooting started, he did not see anyone on the Berry side of the street with a gun. He

testified that the gunfire was coming from the fence on the other side of the street, but he could not see who was shooting. He then got his gun from his car and shot at the "candy apple red" Cadillac he saw pulling out. He stated that he saw some heads in the car, but he could not identify the people in it.

Desmond Lestrapes testified that he went to the night club with Keys and Richard on the night in question. At the club, he saw the fight break out, and he saw Defendant strike Richard with a gun. After the police broke up the fight, Lestrapes returned to the Berry residence. He spoke to Berry and the two women sitting on the cars, and then began walking to the backyard. It was at that point that he heard the first shots. He immediately dropped down between the house and a car. He saw Ms. Comeaux drop to the ground, and then he heard Berry yelling that he had been hit. He raised up and saw Keys, Richard, and Lewis at the gate on the other side, shooting. He testified that he was unable to see who had fired the initial shots. However, he did testify that none of the persons at the Berry residence were armed. Lestrapes further testified that he did not fire a weapon.

Damien "Ed" Richard testified at trial that on the night in question, he was going to the night club with his girlfriend, Felicia Comeaux. Before walking to the night club, they went to Berry's house where they parked Ms. Comeaux's car.

While at the club, he got into an argument with Defendant during which Defendant hit him in the head with a gun. The fight broke up when the police arrived, and he walked back to the Berry residence. He testified that he did not see Coleman at the club. However, he stated that he saw him later that evening when he passed Berry's house house in his car. Richard testified that when Coleman drove by the house, he was the only person in the car.

7

After seeing Coleman pass by, Richard told Ms. Comeaux to remain in the car because "they might try something." He gave her some money to go to the store, but Ms. Papillion arrived, and the two women began talking. Richard walked to the back of the house to use the bathroom. While they were talking, the women were sitting on the cars and Berry was sitting on his porch.

Richard was in the backyard when he heard the shots coming from across the street and observed that the shots were coming from along a fence. He armed himself with a .357 pistol he had placed under the steps and ran across the street with Keys. There, he saw Defendant, Coleman, and a third unidentified individual running back toward Coleman's "candy apple red" Cadillac. Richard testified that he did not see a gun in Defendant's hand.

When he came back across the street, Richard was told that Ms. Comeaux had been shot. Though she was down before he grabbed his gun, he did not realize that she had been hit. Richard concluded by stating that when police arrived, he dropped his gun by the side of the house and fled the scene.

LaShonda Papillion also testified about going to the night club, where she witnessed the fight. However, she stated that she did not see Defendant, because she was in the back of the night club, and the fight had occurred near the front. When police arrived and everyone left the club, she went to Berry's house. Initially, she waited at the Berry residence for Darryl Lastrapes; when he did not arrive, she went to the police station, believing that he may have been there. When she returned to the Berry house, Lastrapes was in the backyard.

She testified that Keys, Lewis, Thomas, Berry, and another unidentified male were also present at the Berry residence on the night in question. When she arrived

at the house, Ms. Papillion began talking to Ms. Comeaux. While they were talking, the two women were between some of the cars, facing the backyard, where they could see Keys and Richard. Lastrapes approached and asked if they wanted anything from the store. As he walked away, the first shots were fired.

Ms. Papillion testified that when she heard the shots, she grabbed Ms. Comeaux, and they ducked down. She stated that after the shots were fired, she stood up to see where Lastrapes was. When she turned back, she saw Ms. Comeaux slumped on the ground. Ms. Papillion stated that she had been holding Ms. Comeaux, and she did not realize that she had been shot. She testified that she heard Berry say that he had been hit, and after the shooting, she looked up and saw two unidentified people running.

Chris Baker was the last eyewitness to testify at trial. He was also present at the night club and at Berry's house on the night of the shooting. In the club, he saw Defendant, with what appeared to be a gun in his hand, fighting with Richard. After leaving the night club, he went to Berry's house, where he later heard the gunfire. Baker testified that when the shots were fired, he was standing and talking to Ms. Comeaux and Ms. Papillion. He stated that Ms. Comeaux was facing the back of the house, and when the gunshots started, he saw the fire coming from the fence. He was not able to identify the individuals who were shooting from the fence, nor was he able to state how many persons were shooting. He, Ms. Comeaux and Ms. Papillion all hit the ground. He testified that he thought that Ms. Comeaux was hit by one of the first shots fired. He stated that the other individuals were in the backyard, and when the gunfire started, they ran to the street. At that time, they were armed, and began

shooting. Baker testified that he raised up after the shooting began and saw Keys across the street shooting.

After the shooting, Baker told Richard that Ms. Comeaux looked as if she'd been hit. The police came immediately, and when they did, Richard told him to look after Felicia, and left the scene, saying "I got to go, I got warrants."

In his brief, Defendant claims that "[i]t was proven that Felicia Comeaux was shot and killed by a .357 magnum bullet." We note that at trial, expert witness, Doug Lancon, testified about the bullet removed during autopsy from the body of Felicia Comeaux. At least five guns were fired at the scene, and Lancon concluded that due to the damage to the bullet, he could not specify the weapon from which the bullet came. Therefore, we find that this claim is not supported by the record.

In his brief, Defendant also asserts that the State failed to prove that he fired the shots that killed the two victims. We note that of the seven eyewitnesses who testified at trial, five of the witnesses were unable to identify the persons who fired shots toward the Berry residence. However, two of the witnesses, Mark Keys and Damien Richard, stated that they saw Defendant at the scene when the shooting occurred. Keys stated that he saw Defendant shooting from the area of the gate, and he positively identified the clothing that Defendant was wearing at that time as the same clothing that he was wearing when he saw him in the night club earlier that evening. Richard stated that after the shooting occurred, he ran across the street and saw Defendant running from the scene toward a car. The remaining witnesses did not testify that persons other than Defendant had fired the shots, but rather, were simply unable to identify the perpetrators. It is well settled that the factfinder is free to accept or reject some, none, or all of any witness' testimony. Pursuant to *Kennerson*

and the jurisprudence cited therein, we are unable to conclude that the trial judge was unreasonable in accepting as credible the testimony of the two witnesses who identified Defendant as one of the persons involved in the shooting. We conclude, therefore, that the trial court was not unreasonable in ultimately finding Defendant guilty as charged. Accordingly, the assignment lacks merit.

Defendant also asserts that the State failed to prosecute him as a principal to the offense of second degree murder, and thus, no legal basis exists for finding him guilty as principal. Further, Defendant concludes that, if the testimony of Mark Keys and Damien "Ed" Richard is deemed by the trial court to be credible, the only offense consistent with that evidence is attempted murder, on each count, because no evidence proves that Defendant fired the shots which killed either victim.

The State may prove a defendant guilty by showing he served as a principal to the crime by aiding another. "Persons who aid and abet in the commission of a crime are guilty as principals although they do not directly commit the act constituting the offense." *State v. Sampson*, 472 So.2d 337, 339 (La.App. 3 Cir. 1985) (quoting *State v. Bernard*, 441 So.2d 817 (La.App. 3 Cir. 1983), *writ denied*, 445 So.2d 439 (La.1984). Louisiana Revised Statutes 14:23 classifies the parties to crimes as either principals or accessories after the fact. Principals are defined by La.R.S. 14:24. The statute states, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Those persons who knowingly participate in the planning or execution of the crime are principals. *State v. Pierre*, 93-0893 (La. 2/3/94); 631 So.2d 427. Accordingly, under the broad definition of "principals" in Louisiana, the

11

court did not have to find that he was the one who fired the shots that killed the victims in order to be convicted of second degree murder. Rather, the court had to find that he was concerned in the commission of a crime, whether he directly committed the act constituting the offense, aided and abetted in its commission, or directly or indirectly counseled or procured another to commit the crime in order to be prosecuted as a principal. In this case, two of the witnesses who testified at trial identified Defendant as part of the group of individuals who were shooting at the Berry house from across the street. One of those witnesses further testified that he could identify Defendant as one of the men shooting from behind the fence across the street.

Regardless of whether Defendant fired the shots that killed the victims, if it is proven that he was involved in the commission of the crime, he may be charged and convicted as a principal. Therefore, considering the evidence and testimony, we do not find that the trial court was unreasonable in finding the evidence sufficient to convict Defendant as a principal for two counts of second degree murder. Accordingly, this contention lacks merit.

**CONCLUSION:**

Defendant's conviction is affirmed.

**AFFIRMED.**