# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #030

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of June, 2026** are as follows:

**BY McCallum, J.:**

2025-K-01032    STATE OF LOUISIANA  VS.  CURTIS LEE STEWART, JR. (Parish of East Baton Rouge)

JUDGMENT OF THE COURT OF APPEAL REVERSED. DEFENDANT'S CONVICTION AND SENTENCE REINSTATED. SEE OPINION.

Griffin, J., dissents and assigns reasons.
Guidry, J., dissents for the reasons assigned by Justice Griffin.

# SUPREME COURT OF LOUISIANA

# No. 2025-K-01032

# STATE OF LOUISIANA

# VS.

# CURTIS LEE STEWART, JR.

On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of East Baton Rouge

**McCALLUM, J.** *

We granted certiorari in this case to consider whether the First Circuit Court of Appeal erred in overturning defendant's conviction and sentence on the ground that the evidence introduced at trial failed to support his conviction for second degree murder. The court, in a two-to-one decision, found that the evidence did not sufficiently "establish the identity of defendant as the perpetrator." *State v. Stewart*, 24-0657, p. 10 (La. App. 1 Cir. 7/31/25), 417 So. 3d 1261, 1268 (Wolfe, J., dissenting).

Our review of the record reveals the evidence adduced at trial was sufficient to satisfy the requirements articulated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), *infra*. Accordingly, the court of appeal erred in reversing defendant's conviction and sentence. For the reasons set forth more fully herein, we reverse the court of appeal's judgment and reinstate defendant's conviction and sentence.

---

* Judge Allison H. Penzato of the Court of Appeal, First Circuit, heard this case as Justice pro tempore, sitting for the vacancy in the First District. She is now appearing as an ad hoc for Justice William Burris.

## FACTS AND PROCEDURAL HISTORY

Defendant, Curtis Lee Stewart, Jr., was indicted by a grand jury on the charge of second degree murder, a violation of La. R.S. 14:30.1. The charges stemmed from the April 25, 2021 shooting death of Devonta Ennis, which was captured by surveillance video from a nearby Dollar General store. On that date, Mr. Ennis was driving a black Mercedes sedan on Prescott Road in Baton Rouge, Louisiana. According to Detective Heather Anderson, at the intersection of Prescott Road and Beechwood Drive, the occupants of a white Chevrolet Traverse and a silver Nissan Armada boxed in Mr. Ennis who was unable to move his vehicle. An occupant of the Traverse then exited the vehicle and opened fire at Mr. Ennis's vehicle, striking Mr. Ennis multiple times. Mr. Ennis died at the scene. The incident was reported to the police around 7:40 p.m.

The Traverse and the Armada were discovered later that evening nearby in a remote park area. Both vehicles had been reported stolen on the evening of the murder and both had been deliberately set on fire. Each vehicle was registered to and/or leased by women with whom defendant had been romantically involved and by whom he had fathered children. The Traverse was registered to Shalana Sims. The Armada had been leased by Tierra Hayes, who lived next door to defendant and defendant's mother. A temporary license tag found near the scene of the murder was traced to the Traverse and DNA testing of the license tag revealed the fingerprints of Ms. Sims.

Defendant was arrested and charged with the second degree murder of Mr. Ennis. Defendant waived a trial by jury and proceeded to a bench trial. The trial court found him guilty and sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. The trial court's per curiam reflects the finding that, based on the circumstantial evidence, and its evaluation under La.

2

R.S. 15:438, *infra*, the evidence "when viewed as a whole, excluded every reasonable hypothesis of innocence."

Defendant appealed, and the appellate court reversed his conviction. The First Circuit based its reversal on the "lack of physical evidence connecting the defendant to the shooting and the lack of any witness identification," and its finding that "the trial court's determination that the shots were fired by the defendant was based on speculation rather than reasonable inferences." *State v. Stewart*, 24-0657, p. 12 (La. App. 1 Cir. 7/31/25), 417 So. 3d 1261, 1269. The court of appeal explained:

> Most glaringly, no rational trier of fact could conclude, beyond a reasonable doubt, that the defendant was the shooter. Even if the trial court reasonably inferred from the evidence that the defendant had access to the Traverse and the Armada and that he was in the vicinity at the time of the shooting, the trial court was required to speculate as to whether the defendant was in one of the two vehicles and, if so, whether the shots were fired by the defendant.
>
> ***
>
> Given the lack of physical evidence connecting the defendant to the shooting and the lack of any witness identification, the trial court's determination that the shots were fired by the defendant was based on speculation rather than reasonable inferences. Very simply put, if two vehicles were involved, and we have no evidence putting the defendant in either vehicle at the time of the shooting, and we cannot say that the defendant was the shooter, the State failed to negate a reasonable probability of misidentification. Therefore, we find that no rational trier of fact could have found the State proved beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator.

*Id*., 24-0657, pp. 12-13, 417 So. 3d at 1269. The State filed a writ application with this Court, which we granted. *State v. Stewart*, 25-01032 (La. 3/3/26), 429 So. 3d 169.

**LAW AND DISCUSSION**

We review the sole issue in this case–the sufficiency of the evidence to support defendant's conviction–under the standard established by *Jackson v. Virginia*, a standard our courts have applied since this Court's decision in *State v. Mathews*, 375 So. 2d 1165 (La. 1979). Under this standard of review, an appellate

3

court is to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis supplied); *See also*, *State v. Abercrombie*, 375 So. 2d 1170, 1178 (La. 1979). The *Jackson* Court reasoned:

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Jackson,* 443 U.S. at 319 (emphasis supplied, footnote omitted).

The Louisiana legislature incorporated the *Jackson* standard of review into our law in La. C.Cr.P. art. 821 B, which provides for the grant of a post-judgment verdict of acquittal "only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." As the official comments to Article 821 reflect, the test is "whether a reasonable fact finder must have a reasonable doubt." La. C.Cr.P. art. 821 (Official Revision Comment). This is an "objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt." *State v. Southall*, 22-0746, p. 6 (La. App. 1 Cir. 6/2/23), 369 So. 3d 925, 930, *writ denied*, 23-00875 (La. 2/6/24), 378 So. 3d 750; *State v. Sutton*, 436 So. 2d 471, 475 n.10 (La. 1983).

Circumstantial evidence "consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience." *State v. Nguyen*, 22-286, p. 12 (La. App. 5 Cir. 2/27/23), 359 So. 3d 108, 119. When the State relies on circumstantial evidence to establish the commission of a crime, La R.S. 15:438 sets forth the applicable standard: "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Our courts

4

have consistently recognized that La. R.S. 15:438 "does not establish a stricter standard of review than the more general *Jackson v. Virginia*, [reasonable doubt] formula." *State v. Moore*, 46,252, p. 16 (La. App. 2 Cir. 5/18/11), 69 So. 3d 523, 532. Rather, the statute "serves as a helpful evidentiary guide for the trier of fact when evaluating circumstantial evidence." *State v. Bowie*, 24-0700, p. 13 (La. App. 4 Cir. 7/1/25), 424 So. 3d 87, *writ denied*, 25-00959 (La. 12/9/25), 422 So. 3d 300. Thus, in cases resting on circumstantial evidence, the evidence "must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *State v. Lloyd*, 21-645, p. 9 (La. App. 5 Cir. 8/24/22), 348 So. 3d 222, 231, *writ denied*, 22-01354 (La. 11/22/22), 350 So. 3d 499.[1]

Importantly, the due process standard set forth in *Jackson* "does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt." *State v. Ellis*, 14-1511, p. 3 (La. 10/14/15), 179 So. 3d 586, 588, quoting *State v. Major*, 03-3522, pp. 6-7, (La. 12/1/04), 888 So. 2d 798, 802. Instead, the reviewing court is to accord much discretion to the fact finder in its determinations of the evidence and witness credibility, and "impinge on this discretion [only] to the extent necessary to guarantee the fundamental protection of due process of law." *Id*. The *Jackson* standard does not a permit a reviewing court to substitute its appreciation of the facts for that of the trier of fact, assess the credibility of the witnesses, or reweigh evidence. *State v. Thompson*, 15-0886, p. 9 (La. 9/18/17), 233 So. 3d 529, 537.

In the instant case, defendant was convicted of the second degree murder of Devonta Ennis. Second degree murder is defined by La. R.S. 14:30.1 A(1) as the

---

[1] *See also*, *State v. Manuel*, 20-172, p. 34 (La. App. 5 Cir. 6/2/21, 325 So. 3d 513, 539, *writ denied*, 21-00926 (La. 10/12/21), 325 So. 3d 1071; *State v. Gabriel*, 18-0169, p. 9 (La. App. 4 Cir. 12/26/18), 262 So. 3d 345, 351.

"killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm." Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10. Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a gun.[2] *State v. Chester*, 19-363, p. 27 (La. App. 5 Cir. 2/3/21), 314 So. 3d 914, 942, *writ denied*, 21-00350 (La. 6/8/21), 317 So. 3d 321. Notably, too, specific intent may be inferred from the circumstances surrounding the offense and from the defendant's conduct. *State v. Bishop,* 01-2548, p. 4 (La. 01/14/03) 835 So. 2d 434, 437.

Defendant maintains that the court of appeal correctly reversed his conviction because "no rational trier of fact could have found that the State proved beyond a reasonable doubt that" defendant was the one who stole the vehicles and later burned them, was the person who shot Mr. Ennis, or paid witnesses to either not testify or to falsify their testimony. We disagree.

We acknowledge that the evidence in this case is circumstantial and that there is no specific physical or DNA evidence linking defendant to Mr. Ennis's murder. We likewise acknowledge that the record does not establish who actually shot Mr. Ennis. However, a careful review of the record indicates a substantial number of facts tending to prove defendant's guilt; and, viewing that evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant was guilty of second degree murder. In reversing defendant's conviction, the court of appeal improperly imposed a requirement that

---

[2] During the 2026 regular session of the Louisiana legislature, the legislature codified this principle by amending La. R.S. 30.1, to add paragraph C, which will provide with respect to paragraph A(1), that "there shall be a rebuttable presumption that the act of pointing and firing a firearm at another human being constitutes specific intent to kill or inflict great bodily harm." *See* 26 La. Act. No. 120, § 1 (effective August 1, 2026).

the State "establish the identity of defendant as the perpetrator," without accounting for defendant's potential liability as a principal.[3]

Under Louisiana law, both statutory and jurisprudential, a defendant whose involvement in a murder is demonstrated by the evidence can be convicted of second degree murder, regardless of whether he directly committed the act, as all persons involved in the commission of a crime are treated as principals. Louisiana Revised Statutes 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

Our case law makes abundantly clear that a person may be convicted as a principal to second degree murder even if he did not personally fire the fatal shot. *See State v. Massey*, 11-357, p. 14 (La. App. 5 Cir. 3/27/12), 91 So. 3d 453, 463-64 ("Whether a defendant actually fires the bullet that strikes and kills a victim is of no consequence and the defendant may be convicted as a principal to the crime."); *State v. Savoy*, 06-191, pp. 11-12 (La. App. 3 Cir. 5/31/06), 931 So. 2d 1207, 1213 ("Under the broad definition of 'principals' in Louisiana, the court did not have to find that he was the one who fired the shots that killed the victims in order to be convicted of second degree murder. Rather, the court had to find that he was concerned in the

---

[3] On this issue, the court of appeal found:

> Here, the State only sought to prove beyond a reasonable doubt that the defendant was the shooter. Unlike in [State v.] Briggs, [24-490 (La. App. 3 Cir. 4/2/25), 603 So. 3d 399,] the State did not attempt to prove the defendant was a principal to the shooting, in the sense that he aided and abetted. In its closing statement, the State unequivocally rejected the hypothesis that the defendant was a principal in the broader sense of the word. The State argued, "[the defendant] ... shot up [the victim][;]" the defendant "didn't miss his mark[;]" and the defendant was "guilty of killing, ambushing, executing" the victim. Further, as to whether or not charging the defendant as a principal was appropriate, the State argued in its rebuttal closing argument, "No. The State chose the right crime of second degree murder because the defendant in this matter murdered [the victim]." Finally, the State concluded that "there's only one person that took [the victim's] life, and [that] man is standing in court today."

*Stewart*, 24-0657, p. 11, 417 So. 3d at 1268-69.

7

commission of a crime . . . . Regardless of whether Defendant fired the shots that killed the victims, if it is proven that he was involved in the commission of the crime, he may be charged and convicted as a principal.").

The court of appeal observed that the State's theory of the case focused on defendant as the actual shooter, rather than as a principal to Mr. Ennis's murder. Irrespective of the State's argument that defendant was the person who shot Mr. Ennis, Louisiana law does not require the State to explicitly charge or argue principal liability for a defendant to be convicted as a principal to second degree murder. Even where the State argues that a defendant is one who committed the murder, he may nevertheless be convicted as a principal. As this Court indicated in *State v. Peterson*, 290 So. 2d 307, 308 (La. 1974):

> Nowhere, in any of our Code of Criminal Procedure provisions or elsewhere, is it required that a person charged with an offense who did not directly commit the act constituting the offense be specifically denominated a 'principal'. Any and all persons involved in the commission of a crime to an extent which will satisfy the definition of 'principal' stated in R.S. 14:24, whether the direct perpetrator of the act constituting the offense or not, may be charged with commission of the offense.

As was reaffirmed in *State v. Miller*, 53,046, p. 10 (La. App. 2 Cir. 11/20/19), 284 So. 3d 1254, 1261 and *State v. Girod*, 16-74, p. 12 (La. App. 5 Cir. 6/30/16), 195 So. 3d 1274, 1283 (citing *Peterson*), "there is no requirement that a bill of indictment or information explicitly name the accused as 'principal.' That the accused is charged for the offense itself, and not charged as an accessory after the fact, irrefutably evidences that he is charged as a principal."

In the recent case of *State v. Briggs*, 25-00529, p. 6 (La. 5/1/26), --- So. 3d ----, 2026 WL 1194509, this Court reviewed a Third Circuit Court of Appeal decision reversing two defendants' convictions on the basis that there was insufficient evidence to support their convictions. Observing that the appellate court erred in substituting its judgment for that of the jury, we found the defendants liable as

8

principals to a drive-by murder based on evidence connecting them to the murder. As in the instant case, the evidence in *Briggs* was circumstantial and linked the defendants to a vehicle involved in the murder.

In *Briggs*, the defendants were first captured on video surveillance from a Walmart store exiting the vehicle shortly before the murder. A vehicle matching the description of the defendants' vehicle is then seen entering an apartment complex where gunshots are heard shortly thereafter. The vehicle is next seen leaving the complex and arriving at a gas station where the defendants are seen switching vehicles.[4] Although the defendants were charged with second degree murder, the Court evaluated their culpability "*as principals* to second degree murder" and concluded that the jury could rationally find that they were active principals in the murder. *Id.*, 25-00529, pp. 5, --- So. 3d at ----, 2026 WL 1194509 at *3 (emphasis supplied).

Our finding in *Briggs* reaffirms the well-settled rule that principal liability applies even where a defendant's precise role in a crime is uncertain, as long as the evidence establishes knowing participation and specific intent. *See State v. Tate*, 01-1658, p. 7 (La. 5/20/03), 851 So. 2d 921, 930 ("[S]o long as the State sufficiently proves that the defendant is a principal and that he possessed the requisite specific intent, a conviction for first degree murder will be upheld."); *State v. Chester*, 19-363, p. 30 (La. App. 5 Cir. 2/3/21), 314 So. 3d 914, 943, *writ denied*, 21-00350 (La. 6/8/21), 317 So. 3d 321 ("We find that the evidence is sufficient to establish that Defendant was either the shooter or a principal to the shooting."); *State v. Williams*, 20-46, p. 37 (La. App. 5 Cir. 12/30/20), 308 So. 3d 791, 822, *writ denied*, 21-00316 (La. 5/25/21), 316 So. 3d 2 ("even if the jury did not find that the State proved beyond a reasonable doubt that Defendant was the actual shooter, the jury could have

---

[4] Based on the timing of the relevant events and the distance between the Walmart store, the apartment complex and the gas station, the jury reasonably concluded that the vehicle entering and leaving the apartment complex was that of the defendants.

found that Defendant was a principal to second degree murder."); *State v. Clark*, 20-167, p. 19 (La. App. 5 Cir. 11/18/20), 306 So. 3d 619, 634, *writ denied*, 20-01459 (La. 2/17/21), 310 So. 3d 1150 ("even though defendant's weapon did not fire the fatal shot, defendant was a principal to the crime. . . [although] [t]he identity of the person or persons who allegedly shot at defendant was also never conclusively determined.").

In the instant matter, the State introduced evidence to show that defendant was, at the least, a principal to Mr. Ennis's murder.

Detective Anderson testified regarding surveillance video from a nearby Dollar General store. The footage is grainy and unclear, and we agree with the court of appeal that "it is difficult to confirm any of the details set forth by Detective Anderson." *Stewart*, 24-0657, p. 12, 417 So. 3d at 1269. Having reviewed the surveillance video, we find the footage too unclear to plainly depict Mr. Ennis being repeatedly shot by an individual who exited the white Traverse, as testified to by Detective Anderson. The footage does, though, show two vehicles matching the description of a white Traverse and a silver Armada.

There can be no doubt that the white Traverse was involved in Mr. Ennis's murder as its temporary license tag was found at the scene. Not only did fingerprints collected from the license tag belong to Shalana Sims, Ms. Sims confirmed the Traverse was registered to her and had temporary tags on it at the time of the murder. There is equally no doubt the Traverse and the silver Armada were both intentionally set on fire hours after Mr. Ennis was murdered in an area near the scene of the murder.

More importantly, both Ms. Sims and Ms. Hayes were romantically involved with defendant and both reported their vehicles being stolen on the night of Mr. Ennis's murder–Ms. Sims around 12:30 a.m. and Ms. Hayes around 11:00 p.m. Ms. Sims made clear that it was defendant who took her car that evening. She told

investigators in a recorded interview conducted on April 25, 2021 that she knew her vehicle had been taken by defendant, as evidenced by the following colloquy:[5]

Q:  So, who took your car?
A:  Curtis [defendant].
Q:  How do you know that Curtis took your car?
A:  Cause that's the only person that would take my car without me knowing. That's the only person that would walk into my house and take my car.

That defendant is the one who took Ms. Sims's car–and, in fact, took it shortly before Mr. Ennis was murdered–is corroborated by the testimony of Michael Fegely, an expert geolocation analyst. Mr. Fegely is employed by Cellx Analytics. As a geolocation analyst, Mr. Fegely compiles data obtained from cell phone records or those of other mobile devices and inputs it into a software program that maps where a device is at any given time. That data is from records kept in the normal course of business. Mr. Fegely indicated that the information he retrieves from a cell phone includes its connections to the cell towers with each incoming and outgoing call, text message or data connection.

Mr. Fegely explained that a typical tower connection, or "cell site," has three sides known as sectors. Each sector is generally responsible for a range of 120 degrees. Cell phone records indicate which tower the phone connected to and which sector of that tower was used for each connection. The data is then mapped to show an estimate of where a phone was during a transaction (whether a call, text message or other connection). As a cell phone or other device moves from place to place, there will be a "handoff," meaning that as the connections between the device and

_____

[5] On the morning of trial, the trial court granted the State's Motion for a Finding of Forfeiture by Wrongdoing, upon finding that, while defendant was incarcerated, he solicited his brother to procure the unavailability of Ms. Sims and Ms. Hayes. The trial court found that the "four recorded jail calls do show that there was an intentional act on the part of the Defendant to secure the unavailability of these witnesses by his brother, Jake. Therefore the Court will allow the testimony that was previously given by Ms. Sims to law enforcement agency be allowed to be admitted into evidence." Accordingly, although Ms. Sims appeared at trial, the trial court allowed her videotaped interview to be played for the court after it declared her unavailable because she was "refusing to answer her questions truthfully, given the fact that the Court has already granted the State's motion to proceed."

the signal weakens, the device is "going to handoff to a different cell site" or to a different sector within the same cell site or cell tower.

In this case, Mr. Fegely was provided with defendant's telephone number as well as locations provided by the District Attorney's office, from which he produced mapping records of defendant's cell phone usage. Those locations included Ms. Sims's address and the location of Mr. Ennis's murder. Mr. Fegely first recorded an outgoing call at 6:36 p.m. on the day of Mr. Ennis's murder, April 25, 2021. Significantly, at that time, defendant's cell phone connected to a cell site in the area of Ms. Sims's address. Seven minutes later, at 6:43 p.m., another outgoing call was made and the cell phone's connection was handed off to another site in the general area, indicative of movement. Defendant's phone next received an incoming call at 6:50 p.m. and it connected to a different cell site that was "pointed due west." Mr. Fegely explained: "between 6:36 [p.m.] and 6:50 [p.m.] what we saw was that device was moving enough that it required different cell sites for each of those connections over that approximately 14-minute period."

At 6:55 p.m., a data connection was made with defendant's phone and it was then in the area of the murder on Prescott Road. The same cell site and area was noted with another data connection at 6:56 p.m. At 7:00 p.m., the phone received a text message at which time it was connected to a different cell site and sector, which Mr. Fegely indicated is indicative of movement. Several other connections between 7:09 p.m. and 7:22 p.m. reflect that the phone continued to move in the general area.

The records reflect several incoming and outgoing text messages between 7:27 p.m. and 7:30 p.m., with connections to the same cell site and sector. According to Mr. Fegely, this signifies "not enough movement for a handoff at this point." At 7:30 p.m., however, a data connection reflected a handoff to a new connection, with another new connection at 7:32 p.m. to a cell site "further north and east of the Prescott Road address." These signify movement at that time.

12

The records showed a different connection at 7:35 p.m. Mr. Fegely explained:

. . . [T]he last connection was that cell site that was just north and east of Prescott Road. This one is now north and west of Prescott Road. So between that time period, about two minutes, we have a handoff so again, indicative of movement.

At 7:38 p.m., an incoming text message showed that the cell phone was connected to a sector "that's pointed directly to the west." By 7:45 p.m., the cell phone was "back on that cell site and sector that is adjacent to" Ms. Sims's address (the first cell site and sector). The device was mapped thereafter and Mr. Fegely noted "a lot of travel and a lot of connections," including east and northwest of Baton Rouge. When it was shut off around 10:00 p.m., it was back in the same general area.

In Mr. Fegely's opinion, based on the movement of the cell phone, the connections it made necessitated movement "likely, in a vehicle" as the distance it moved "within a minute or two. . . would have to be in a motor vehicle. . . or at least something motorized."

On cross-examination, Mr. Fegely conceded that, while the cell phone was in the area of Ms. Sim's house and the 4700 block of Prescott Road, where the murder took place, he is unable to pinpoint the phone's exact locations. He also agreed that the range between Ms. Sims's house and the Prescott location is approximately four miles, indicating that defendant's cell phone was located within a four-mile radius. Mr. Fegely further testified that there was an incoming call at 6:43 p.m. that lasted approximately 68 minutes, which encompassed the time of the murder. As he previously indicated, though, there was other cell phone usage during that time, including text messages and data connections. Mr. Fegely explained that the call may have been placed on hold or been inactive.

The fact that, on the night of Mr. Ennis's murder, defendant's phone connected to various cell towers where the important events took place–the theft of

13

Ms. Sims's vehicle and Mr. Ennis's murder–is not mere coincidence. To the contrary, it is strong evidence of defendant's involvement in the murder and supports the trial court's determination of defendant's guilt. Although the cell phone records reflect regular movement of defendant's phone, they also reveal no apparent movement between 7:27 p.m. and 7:30 p.m., when the phone hands off to another connection. This is consistent with the approximate time of the murder, as Detective Anderson indicated that the entire transaction was "real quick" and the police were notified around 7:40 p.m.

In his brief to the Court, defendant contends that the cell phone evidence is "unavailing," insofar as the presence of his phone "in or around a four-mile radius of the shooting does not indicate that 'he' was present at the location of the shooting." He further argues that the inference that he was present "disregards circumstances where the person may have either left their phone behind, lent their phone to a third person, or where the person's cellular telephone may have received a phone call from someone in a different location, thus skewing the exact location of the person under surveillance." We find this argument to be unconvincing.

During a June 24, 2021 interview with Detective Anderson, after defendant signed a form waiving his rights, defendant denied being involved in the murder and being at the scene when it occurred. When confronted with the evidence of his cell phone connections on the night of Mr. Ennis's murder, defendant had no explanation as to why his cell phone would have been in those areas at those times. Defendant did not suggest that he had loaned his phone to someone else, or had otherwise "left his phone behind." The absence of any explanation for his cell phone connections to the area where Ms. Sim's vehicle was stolen and later to the area of the murder is simply implausible.

The trial court's finding of defendant's guilt is also supported by additional evidence beyond this substantial cell phone data. First, Detective Anderson testified

14

about an interview with Ms. Sims shortly after the murder. In that interview, Ms. Sims reported that, on the day of the murder, she had gone to sleep around 5:00 p.m. and when she awoke after midnight, she realized her vehicle was missing. She then contacted defendant, who told her to "leave it alone, don't ask questions about it, just let it be." At that point, she knew defendant had taken her vehicle, which, as previously noted, was found several hours after the murder, having been intentionally set on fire along with the Armada leased by Ms. Hayes.

Second, Lashonda Boyd, an investigator with the East Baton Rouge Parish District Attorney's office, testified regarding her review of jail house telephone calls, including two calls that took place in October 2023. In the first call between Tierra Hayes and defendant, Ms. Hayes asked about a check that defendant's lawyer had and further asked "why can't the lawyer just release the money?" Defendant responded that "he needed to talk to him first to see what happens in court before he tells him to release the money."

The second call was between defendant and his brother, Jake. In that call, defendant first admonished his brother "to watch how he talked, because they were on the phone." Ms. Boyd then described the conversation as follows:

> [He] [a]sked him if everything was everything, and Jake says that it's on the up and up. He told him to make sure he knew everybody's whereabouts. That he was going to talk to his lawyer to get him the checks, and that he had to get it to who it needed to go to. He talked about calling Tierra [Hayes] to tell her to stay silent, and that you know, she shouldn't be worried, because she didn't even give a statement, and that she shouldn't even have to worry about that if she do what she's supposed to do.

Furthermore, during the interview with Detective Anderson, defendant denied that he knew the victim. Yet halfway through the interview, he referred to the victim by his nickname, "Vonta," a nickname identified by Ms. Sims and Ms. Hayes, signifying defendant's dishonesty.

15

Combined with the evidence of defendant's cell phone connections on the night of the murder, the foregoing evidence clearly forms the basis for the trial court's determination that defendant is guilty of second degree murder. It further supports the trial court's determination "that the Defendant sought to procure the unavailability of two State witnesses, Shalana Sims and Tierra Hayes, connected to the offense."

As our jurisprudence consistently recognizes, a defendant's attempt to intimidate or otherwise silence a witness is generally admissible as evidence of consciousness of guilt. This Court observed in *State v. Burnette*, 353 So. 2d 989, 992 (La. 1977), that "actions by the defendant which are designed to prevent witnesses from testifying give rise to an inference that the defendant acted from an awareness or consciousness of his own guilt." The Court reasoned that this evidence "has substantial probative value in a proceeding designed to test the guilt or innocence of an accused." *Id*.

Likewise, defendant's instructions to Ms. Sims that she refrain from asking questions about her vehicle and to "leave it alone,. . . let it be" reflect an awareness on defendant's part that a discussion of those matters could be incriminating, thereby supporting an inference of consciousness of guilt. In the same manner, despite denying knowing Mr. Ennis when he was interviewed, defendant subsequently referred to him by his nickname, contradicting his prior statement, also supporting an inference of a guilty mind. *See*, *e.g.*, *State v. Taylor, 14-0432,* p. 10 (La. 3/17/15), 166 So. 3d 988, 995 ("rational [triers of fact] could find from the lie a consciousness of guilt."); *State v. Mitchell*, 99-3342, p. 11 (La. 10/17/00), 772 So. 2d 78, 85 ("the defendant's untruthfulness does support a 'guilty mind'"); *State v. Captville*, 448 So. 2d 676, 680 n.4 (La. 1984) ("'Lying' has been recognized as indicative of an awareness of wrongdoing."). Furthermore, according to Detective Anderson, defendant provided investigators with a phone and phone number that were neither

the device nor the number he was using at the time of the murder, thereby supporting an inference that he sought to conceal evidence of his involvement.

Defendant points to certain alleged deficiencies in the evidence, including the failure of the State to conduct DNA testing of blood on a rifle found at the scene of the murder, or swabs taken from bullet casings found at the scene. Defendant also emphasizes the State failed to charge defendant with arson or any crime associated with the deliberate burning of the two vehicles. We are not persuaded that any of the purported evidence would have altered the trial court's finding of defendant's guilt, given the substantial evidence implicating defendant in Mr. Ennis's murder.

Nor do we find merit to defendant's contention that the State failed to meet the "specific intent" element of the charge of second degree murder. Whether a defendant had the requisite specific intent is a question of fact. *See State v. Seals*, 09-1089, p. 14 (La. App. 5 Cir. 12/29/11), 83 So. 3d 285, 306. The determination of specific intent "is an ultimate legal conclusion" to be decided by the trier of fact. *See State v. Graham*, 420 So. 2d 1126, 1128 (La.1982). As the *Graham* Court indicated, "specific intent is a state of mind. . . ." *Id.*, 420 So. 2d at 1127. More particularly:

> Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances.

*State v. Ledezma*, 24-0258, p. 4 (La. App. 1 Cir. 12/27/24); 404 So. 3d 988, 994, w*rit denied*, 25-00114 (La. 4/8/25), 405 So. 3d 574.

At a minimum, "[t]he act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." *State v. Magee*, 24-435, p. 16 (La. App. 5 Cir. 7/16/25), 420 So. 3d 158, 172. Even more importantly, "[t]he fact that multiple shots are fired at a victim indicates a defendant's culpable state of mind and satisfies the specific

17

intent to kill requirement for murder." *State v. Poullard*, 03-940, p. 21 (La. App. 3 Cir. 12/31/03), 863 So. 2d 702, 718.

Here, according to the coroner who conducted Mr. Ennis's autopsy, Mr. Ennis sustained eight bullet wounds and the record reflects there were twenty-two bullet holes in Mr. Ennis's Mercedes, both to the front and to the rear of the vehicle. The sheer number of shots directed at Mr. Ennis clearly supports a finding of specific intent. And, the evidence implicating defendant in Mr. Ennis's murder–including his attempts to prevent the witnesses from testifying, his cell phone records placing him in the area of the murder within an hour after his phone pinged near Ms. Sims's home where her vehicle was stolen, and his admonishing Ms. Sims not to ask any questions about her vehicle–are all "circumstances of the transaction and actions of the defendant" indicating defendant's "culpable mind," satisfying the specific intent requirement for second degree murder. In *State v. Lewis*, 46,513, pp. 27-28 (La. App. 2 Cir. 9/28/11), 74 So. 3d 254, 267, the court found:

> Despite the fact that most of the DNA evidence did not provide a direct link to [the defendant's] involvement in the murder, there was sufficient other evidence that proved the essential elements of second degree murder and his participation in the crime. Even if the state was not able to establish that [the defendant] was responsible for firing the fatal shots into [the victim's] body, there was sufficient evidence presented by the state from which the trier of fact could have determined that [the defendant] was actively involved in the crime. . . . The defendant's actions showed that he appeared to be intricately involved in the crime, and his intent or state of mind could be inferred from his actions.

Based on the foregoing, regardless of whether the defendant fired the shots that killed Mr. Ennis, we find defendant was at least guilty as a principal to second degree murder. As we found in *Briggs*, "there is a direct temporal relationship between defendant['s] coordinated movements before, during, and after the shooting, which strongly supports the trial court's findings." *Briggs*, 25-00529, pp. 14-15, --- So.3d at ----, 2026 WL 1194509 at *7.

18

Thus, viewing the evidence presented at trial in the light most favorable to the State, we are convinced that any rational trier of fact could find the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder. The court of appeal erred in substituting its judgment for that of the trial court.

## DECREE

For the reasons set forth herein, we reverse the court of appeal's judgment and defendant's conviction and sentence are reinstated.

SUPREME COURT OF LOUISIANA

No. 2025-K-01032

STATE OF LOUISIANA

VS.

CURTIS LEE STEWART, JR.

*On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of East Baton Rouge*

**GRIFFIN, J., dissents and assigns reasons.**

The majority affirms the defendant's conviction based on a theory of the case rejected by the prosecution and that was not presented to the fact finder in any meaningful way. This violates the due process clauses under the United States Constitution. *Dunn v. United States*, 442 U.S. 100, 106–107 (1979), *Commonwealth v. Bellard*, 494 Mass. 446, 455 (2024) ("the jury's verdict may not be affirmed on the basis that there was sufficient evidence to establish an alternative theory of the crime.") (internal quotations omitted), *State v. King*, 321 Conn. 135, 149 (2016), *State v. Carter*, 317 Conn. 845, 854 (2015)("the state cannot change the theory of the case on appeal…In order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon review of the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.") (cleaned up), *Wooley v. State*, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008), *Cola v. Reardon*, 787 F.2d 681, 693 (1st Cir. 1986).